08-1772-TSH

1

<u>AFFIDAVIT</u>

2

Krista L. Corr, Special Agent, Federal Bureau of Investigation ("FBI"), being

3

duly sworn, states:

4

1.  I have been a Special Agent of the FBI for 19 years and have been

5

assigned to the Public Corruption Squad of the Boston office of the FBI since 1991. In this

6

assignment, I have been involved in the investigation of public corruption and other

7

offenses which are violations of federal statutes within the jurisdiction of the FBI. I

8

personally participated in the investigation of violations of federal law by DIANNE

9

WILKERSON ("WILKERSON") set forth in this affidavit.

10

2.  This affidavit is submitted in support of a criminal complaint charging

11

WILKERSON with attempted extortion under color of official right in violation of 18

12

U.S.C.§1951 and theft of honest services wire fraud in violation of 18 U.S.C.§§1343 and

13

1346.

14

3.  This affidavit summarizes a covert investigation into the criminal

15

activities of WILKERSON and others which has spanned a period of approximately

16

eighteen months. Since this affidavit is being submitted for the limited purpose of

17

establishing probable cause to believe that WILKERSON committed violations of 18

18

U.S.C.§§ 1951, 1343 and 1346, I have not included each and every fact known to me

19

concerning this investigation. The foregoing facts are based on my personal participation in

20

this investigation, as well as reports made to me by other agents of the FBI, including those

21

working in an undercover capacity, and from a review of information provided to FBI

22

agents by individuals associated with this investigation. A substantial portion of the

23

evidence in this affidavit is based on consensual surreptitious recordings made by FBI

24

undercover agents and a cooperating witness. During the course of this investigation more

25

than 150 recordings were made.

26

**BACKGROUND OF DEFENDANT**

27

4.  DIANNE WILKERSON (YOB 1955) has a residence on Howland Street

28

in Boston, Massachusetts. WILKERSON is an elected member of the Massachusetts

1

1    Senate, serving the Second Suffolk Senate District, comprised of precincts in the City of

2    Boston, including Back Bay, Beacon Hill, Chinatown, Jamaica Plain, Mission Hill,

3    Roxbury, the South End, and parts of the Fenway, Dorchester, and Mattapan.

4    WILKERSON was first elected to the Massachusetts Senate in 1992, and has been re-

5    elected every two years since then; she is serving her eighth term. According to information

6    published by the Massachusetts Senate, WILKERSON serves on the following committees:

7          Senate Chair, Joint Committee on State Administration and Regulatory
          Oversight
8          Vice-Chair, Joint Committee on Financial Services
          Member, Senate Committee on Ways and Means
9          Member, Joint Committee on Bonding, Capital Expenditures and State
          Assets
10         Member, Joint Committee on Education
          Member, Joint Committee on Mental Health and Substance
11         Abuse

12         5. **Prior Federal Conviction:** In September 1997 a four-count criminal

13   Information was filed in the United States District Court for the District of Massachusetts

14   charging WILKERSON with willful failure to file tax returns in violation of 26 U.S.C.

15   §7203. (United States v. Dianne Wilkerson, Crim.No. 97-10243 (D.Mass)). WILKERSON

16   pleaded guilty to those charges on September 23, 1997. On December 5, 1997,

17   WILKERSON was sentenced to 24 months of probation, with the first six months served in

18   home detention, and a $2,000 fine. On June 12, 1998, WILKERSON was found in

19   violation of the terms of her probation and was re-sentenced to a period of 24 months

20   probation to include a 30 day period of confinement in a half-way house.

21         6. **History of Campaign Law Violations**: WILKERSON has an extensive

22   and persistent history of violating state campaign finance laws extending back to her first

23   Senate campaign in 1992. On March 31, 1998, WILKERSON entered into a disposition

24   agreement with the Massachusetts Office of the Attorney General ("AG") and the

25   Massachusetts Office of Campaign and Political Finance ("OCPF") related to numerous

26   violations of campaign finance laws during her 1992 and 1994 campaigns for Senate and

27   her 1995 annual filing. Among other things, WILKERSON's campaign was required to pay

28   a civil forfeiture of $10,000 and WILKERSON herself was required to pay a civil forfeiture

2

1    of $1,500. In 2005, the AG and OCPF filed a civil action against WILKERSON and her

2    campaign in Suffolk Superior Court for additional campaign law violations beginning in

3    2000. (Director of the Office of Campaign and Political Finance and Commonwealth of

4    Massachusetts v. Dianne Wilkerson, et al., Sup.Ct.No. SUCV2005-04123.) These new

5    violations were alleged to be "more pervasive" than the violations covered by the 1998

6    agreement. In late July 2008, WILKERSON signed a settlement agreement with the AG

7    and OCPF which addressed a persistent pattern of campaign contribution law violations

8    from 2000 to 2007. The settlement addressed violations in record-keeping practices,

9    apparent use of campaign funds for WILKERSON's personal benefit or the benefit of

10    others, receipt of prohibited campaign contributions, improper reimbursements of campaign

11    funds to WILKERSON and others, and failure to disclose certain campaign contributions

12    and expenditures in OCPF filings. In the settlement, WILKERSON admitted to violations

13    of the campaign finance laws and agreed to: personally forfeit $10,000; not seek

14    reimbursement for approximately $29,000 in claimed campaign expenditures; greater

15    restrictions on the manner in which her campaign fund is managed; and hightened auditing

16    by OCPF through January 2015. WILKERSON entered into this agreement with the AG's

17    Office during the same period that she was taking thousands of dollars in bribes from a

18    cooperating witness and FBI undercover agents, as set forth below.

19         7. **False Testimony in State Court:** On October 3, 2005, WILKERSON

20    testified under oath at a hearing in Suffolk Superior Court in a murder case captioned:

21    Commonwealth v. Jermaine Berry, Doc.No. 94-11635. WILKERSON was called as a

22    witness for the defense during hearings related to the defendant's motion for a new trial.

23    Among other things, WILKERSON testified under oath that she was present when police

24    interviewed Isaac WILKERSON, another suspect in the murder. She also testified that

25    during the police interview, the officers turned off the recording device at least three times

26    and obtained additional oral, unrecorded statements from Isaac Wilkerson which allegedly

27    exculpated Jermaine Berry. The Boston Police Detectives who conducted the interview of

28    Isaac Wilkerson testified under oath that WILKERSON was not present during the recorded

1   interview and that they did not turn on and off the recording during the Isaac Wilkerson
2   interview. The tape recording of the Isaac Wilkerson interview bears no evidence of
3   WILKERSON being present or of statements which WILKERSON alleged that Isaac
4   Wilkerson made during the interview. After hearing WILKERSON's testimony and that of
5   the detectives, the Superior Court concluded in a written opinion dated January 23, 2006,
6   which rejected the motion for a new trial: "Dianne Wilkerson's testimony that Isaac made
7   additional unrecorded statements during his interview with the police, and her claims that
8   she was present during this interview are irreconcilable with the tape recording and the
9   police record of the interview." After the hearing, the FBI was requested to analyze the
10  original interview tape to determine whether it could be forensically established that
11  WILKERSON perjured herself during the Superior Court proceeding. An FBI forensic
12  analysis of the recording, completed on or about June 12, 2007, directly contradicts
13  WILKERSON's sworn testimony: the analysis of the tape concluded that the recorded
14  interview of Isaac Wilkerson was completed without the recorder being shut off at any time
15  prior to the conclusion of the interview.

16  ## DEJA VU: CASH BRIBES FOR LIQUOR LICENSE/LEGISLATION

17          8. In early 2007, an individual who later became a cooperating witness
18  ("CW") informed the FBI that WILKERSON routinely took cash payments from
19  constituents and others having business before the Senate. The CW also told the FBI that
20  he was present for two cash payments made to WILKERSON in connection with the
21  operation of a nightclub in WILKERSON's district in Roxbury, Massachusetts. On the first
22  occasion, WILKERSON was given a cash payment to assist a club owner in relocating his
23  nightclub to a new location in Roxbury. On the second occasion, a cash payment was made
24  to WILKERSON after the club owner learned that she was delinquent on her mortgage.
25  Separate interviews with the club owner confirmed that payments were made to
26  WILKERSON on behalf of the club.

27          9. On or about December 2006, prior to the CW's involvement in this
28  investigation, the CW approached WILKERSON for assistance in opening a proposed club

4

1   to be located in the Crosstown Center on Melnea Cass Boulevard in Roxbury,

2   Massachusetts. The proposed club was to be operated under the name Back Bay

3   Entertainment, Inc. d/b/a Dejavu Restaurant/Lounge ("Dejavu"). The Crosstown Center

4   was in WILKERSON's senatorial district and WILKERSON had been involved in its

5   development. Among other things, the CW sought WILKERSON's assistance in obtaining

6   a liquor license for Dejavu.

7           10. Liquor licenses in the City of Boston are issued by the City of Boston

8   Licensing Board ("BLB") upon application, a public hearing, and after review and approval

9   by the Massachusetts Alcohol Beverages Control Commission ("ABCC"). A standard

10   liquor license is transferrable by the licensee, after review and approval by the BLB and

11   ABCC. During the relevant time period, transferable liquor licenses were being sold on the

12   open market for approximately \$250,000 to \$300,000 each. However, a limited number of

13   nontransferable liquor licenses had been authorized by state statute and were available

14   directly from the BLB. Those licenses cost the recipient only an annual fee of \$2,900 plus

15   \$1.00 per seat. The CW sought WILKERSON's assistance in obtaining one of these

16   nontransferable liquor licenses from the BLB for Dejavu in order to avoid the substantial

17   capital cost of purchasing a transferable liquor license on the open market.

18           11. Initially, the CW did not pay WILKERSON a bribe for her assistance in

19   obtaining a nontransferable liquor license from the BLB. The CW's application for a

20   nontransferable liquor license was rejected by the BLB on or about April 2007.

21           12. At the direction of the FBI, in May 2007, the CW again initiated

22   discussions with WILKERSON seeking her assistance in obtaining a nontransferable liquor

23   license for Dejavu. In a telephone conversation that was audio recorded on or about May

24   30, 2007, the CW asked for WILKERSON's assistance in obtaining such a license. The

25   CW told WILKERSON that he would "take care of you" (referring to the payment of cash)

26   in exchange for her assistance. WILKERSON responded that she would "kick some tires"

27   to which the CW again told her, "I'll see you and I'll take care of you."

28           13. **First Cash Payment at Scollay Square (\$500)**: On June 5, 2007, the

5

1   CW met with WILKERSON for lunch at the Scollay Square Restaurant on Beacon Hill.
2   The meeting was surreptitiously audio and video recorded. During the course of their
3   conversation, WILKERSON assured the CW that Dejavu would get a liquor license from
4   the BLB and that he would get notification of it in the mail. In response, the CW handed
5   WILKERSON $500 in cash and told WILKERSON that he would see her again when he
6   had the license in hand. Two still images from the video recording of the CW handing
7   WILKERSON $500 cash are attached as Exhibits A and B. The CW also told her that as
8   soon as he got the license, he would have a grand opening and "take care of you."

9       14. **Wilkerson Lobbies the Mayor**: On or about June 17, 2007,
10  WILKERSON spoke with the CW on the telephone about her efforts to obtain Dejavu a
11  nontransferable liquor license. At the direction of the FBI, the call was recorded. She told
12  the CW that she "talked to the Mayor" that morning and had also spoken with the Mayor
13  the night before about the license for Dejavu. She told the CW that she had been informed
14  that the Mayor's assistant could help in obtaining a nontransferable license to sell beer and
15  wine until a full liquor license "freed up." The CW expressed his appreciation for
16  WILKERSON's efforts and told her, "I want to give you something. I want to see you on
17  Monday [6/18/07]." In response, WILKERSON boasted about all of the calls she had
18  placed on the CW's behalf: "we've burned up, burning up the phones right now." The CW
19  told her that he wanted to "take care of you for your time and effort." WILKERSON
20  suggested that they meet at the No.9 Park Restaurant on Beacon Hill on June 18, 2007.
21  WILKERSON told the CW that she had a noon lunch meeting with the Consul General of
22  Taiwan, and the CW could meet her there at the conclusion of the lunch at 1 p.m.

23      15. **Second Cash Payment at No. 9 Park ($1,000)**: On June 18, 2007,
24  WILKERSON and the CW met at the bar at No. 9 Park at approximately 1 p.m. The
25  meeting was surreptitiously audio and video recorded. WILKERSON told the CW that she
26  had spoken with the Mayor and his assistant about getting the club a full liquor license and
27  that a beer and wine license was not adequate. The CW handed WILKERSON $1,000 in
28  cash and said, "that's a thousand dollars, all right? . . . You tell me what you want. If this

6

goes through, you got it. You, you tell me your price. Okay? And I am not playing around." A still image from the video showing the CW handing WILKERSON $1,000 in cash is attached as Exhibit C. WILKERSON responded, "I gotcha . . . okay . . .I gotcha." WILKERSON then shoved her hand up her shirt and stuffed the $1,000 in cash in her bra. A still image from the video showing WILKERSON stuffing $1,000 in cash in her bra is attached as Exhibit D. The cash taken by WILKERSON was in the following denomination: ten $100 bills. The serial numbers of the bills were recorded by the FBI.

16. **Wilkerson Escalates Efforts**: On June 21, 2007, WILKERSON spoke with the CW on the telephone regarding her ongoing efforts to obtain a liquor license for Dejavu. The call was recorded. She told the CW that she spoke with the Mayor, the Mayor's assistant, the Chairman of the BLB, the Senate chairman of the Joint Committee on Consumer Protection and Professional Licensure (referred to herein as "Senator Y"), and the Chairman of the ABCC about obtaining a liquor license for Dejavu. The CW responded, "I appreciate it. . . I will take care of you, okay?" The Joint Committee on Consumer Protection and Professional Licensure is responsible for all legislative matters concerning the issuance of licenses for the sale of alcoholic beverages. The ABCC is the state entity responsible for reviewing and approving all liquor licenses issued by the BLB.

17. **Wilkerson's Letter to the Mayor**: Approximately four days after the CW's $1,000 payment at No. 9 Park, WILKERSON wrote a letter on her Senate stationary and had it delivered to both the Mayor of Boston and the Chairman of the BLB. In that letter WILKERSON sought to "secure a license for Deja vu immediately."

18. **Wilkerson's Hold on Boston City Council Legislation**: Between mid-June 2007 and mid-July 2007, WILKERSON continued to pressure the City of Boston and the BLB on behalf of the CW. Among other things, WILKERSON told the CW in a recorded conversation on or about June 30, 2007, that she sent a letter to all Boston City Councilors regarding the unavailability of alcohol licenses for businesses in her district and called for a City Council hearing on the issue. WILKERSON told the CW in a recorded conversation on or about July 11, 2007, that she sent a package of material to a Boston

7

1   Globe columnist about the lack of liquor licenses available to minorities in the City of

2   Boston. On or about July 19, 2007, WILKERSON told the CW in a recorded conversation

3   that she had pressed the Boston City Council President the day before to get a license for

4   Dejavu. In that same recorded conversation, WILKERSON told the CW that she was

5   delaying a piece of legislation pending in the Senate proposed by the City of Boston in order

6   to get a license for Dejavu. That proposed legislation, House No.4162, called for a one-

7   time elimination of a preliminary election for Boston City Council seats, and was designed

8   to save the City of Boston more than \$500,000. In that call, WILKERSON boasted of her

9   efforts to stall the legislation to leverage a liquor license for Dejavu. WILKERSON said

10   that the City Council President reacted angrily to WILKERSON's use of her political clout

11   to stall the legislation. WILKERSON told the CW that her efforts were directed at getting

12   Dejavu a license rather than making a larger political point: "[City] Councillor [Name], he

13   wants to have a hearing. I want a license."

14            19. **Wilkerson's Hold on Pay Raises for the Boston Licensing Board**:

15   Between late July and mid-August 2007 WILKERSON increased her efforts to leverage a

16   liquor license for Dejavu. For example, in a recorded call with the CW on July 31, 2007,

17   WILKERSON told the CW that she had been speaking with the City Council President and

18   the BLB Chairman about obtaining a license for Dejavu. During that conversation, the CW

19   told WILKERSON that his financial backer was disappointed with the process and was

20   ready to withdraw his proposal to open the club. WILKERSON responded that the CW

21   should tell her their plans because, "I don't need to pick an unnecessary fight." The CW

22   thanked WILKERSON for her efforts and said, ". . . I do have something for you for . . .

23   [the] time that you put in." The following day, the CW left a message for WILKERSON

24   telling her that he had a new financial backer who may be interested in opening a club and

25   would like to introduce that new backer to WILKERSON. On August 1, 2007,

26   WILKERSON spoke again with the CW in a recorded call. WILKERSON noted that she

27   had been successful in placing a hold on a second piece of legislation proposed by the City

28   of Boston which would increase the salaries paid to members of the BLB (House No. 2012).

1  WILKERSON told the CW that she had spoken with the Senate President about her efforts
2  to obtain a liquor license for Dejavu. According to WILKERSON, she persuaded the
3  Senate President to call the City Council President to press her for a liquor license.
4  WILKERSON also told the CW that the City Council President then asked the Senate
5  President to facilitate a meeting among WILKERSON, the BLB Chairman, Senator Y and
6  the City Council President. WILKERSON told the CW that when asked if her efforts were
7  aimed at obtaining one liquor license or making a larger policy point, WILKERSON
8  responded that she wanted the license for the CW. At the end of the call, the CW asked, "so
9  you're gonna grab a license, huh?" To which WILKERSON responded, "We're gonna, I
10  told you we're going to get one." The CW then informed WILKERSON, "Well, I got
11  something I want to give you . . . tomorrow."

12      20. **Third Cash Payment at the Fill-A-Buster ($1,000):** On or about
13  August 2, 2007, the CW met with WILKERSON in her State House office. The meeting
14  was surreptitiously audio and video recorded. WILKERSON suggested that they leave the
15  State House for their meeting. After leaving the office, WILKERSON told the CW that
16  "they are busting tail" and that the CW should get his license in a matter of weeks rather
17  than months. As they made their way to the Fill-A-Buster eatery on Beacon Hill,
18  WILKERSON explained that she was using a contact in private industry and an affiliated
19  lawyer to assist putting together a license application package for Dejavu that would
20  achieve their goal of obtaining a liquor license. She also reiterated her successful lobbying
21  of the Senate President and the efforts that the Senate President was taking to obtain the
22  license. WILKERSON also said that unless the license was provided to Dejavu, the
23  Licensing Board members will "not [be] getting a pay raise. Okay? Be clear. It's not
24  gonna happen." During the course of their conversation at the Fill-A-Buster, the CW
25  handed WILKERSON $1,000 in cash, saying "that's a grand." WILKERSON replied,
26  "Thank you. Thank you so much." Still images from the video showing the WILKERSON
27  taking $1,000 in cash from the CW are attached as Exhibits E and F. The cash taken by
28  WILKERSON was in the following denominations: five $100 bills and ten $50 bills. The

9

1    serial numbers of the bills were recorded by the FBI.

2              21. Later that day, on or about August 2, 2007, the CW met with a lawyer
3    recommended by WILKERSON. The lawyer told the CW that he would not charge the CW
4    for handling the licensing issue for Dejavu. The lawyer also told the CW that the BLB
5    Chairman had committed to WILKERSON that he would take care of the situation, and that
6    he did not want to be on WILKERSON's "bad side." The lawyer told the CW that he was
7    in direct communication with the BLB Chairman and that the Chairman would issue the
8    liquor license immediately if he could, but there were no available nontransferable liquor
9    licenses. The lawyer told the CW that the Chairman could issue a beer and wine license,
10   and Dejavu would be first in line for a full liquor license.

11             22. Over the following two weeks, at the direction of the FBI, the CW
12   agreed to an interim solution to obtaining a nontransferable liquor license for Dejavu. The
13   attorney recruited by WILKERSON, who was also a close associate of the Chairman of the
14   BLB, had proposed that Dejavu accept a nontransferable beer and wine license on the BLB
15   Chairman's assurance that Dejavu would get the first nontransferable liquor license which
16   became available. The CW told the attorney and WILKERSON that he was willing to
17   accept a beer and wine license in the short-term, as long as he could get a full liquor license
18   before the club opened in several months.

19             23. On August 15, 2007, WILKERSON informed the CW in a recorded call
20   that she was planning to meet with the Senate President, the BLB Chairman, Senator Y, and
21   the City Council President. WILKERSON again reiterated that the BLB members were not
22   getting legislative authority for a pay raise until the liquor licensing issue with Dejavu was
23   resolved. WILKERSON was critical of the BLB Chairman and noted to the CW: "he ain't
24   getting paid." The CW told WILKERSON, "you will be taken care of, trust me, okay?"

25             24. **Boston Licensing Board "Smoke and Mirrors"**: On the same day,
26   August 15, 2007, the BLB held a public hearing at Boston City Hall. Dejavu's application
27   for a license did not appear on the agenda that day. Agents attended the public hearing and
28   there was no public discussion of Dejavu's application or a public vote to grant Dejavu any

10

1    type of license. Despite this, the attorney recruited by WILKERSON later left a message

2    for the CW telling him that "the vote was in" and that the beer and wine license had been

3    approved. When the CW subsequently told WILKERSON in a recorded call that there was

4    no mention of Dejavu's application at the BLB public hearing but that the attorney claimed

5    that the license was granted, WILKERSON responded that the way the BLB did its business

6    was "all smoke and mirrors." The following morning, August 16, 2007, the CW, at the

7    attorney's direction, called WILKERSON and left her a voicemail message requesting that

8    WILKERSON be "very, very nice" to the BLB Chairman at the meeting scheduled for that

9    day. The attorney subsequently left a message on the CW's telephone stating that he had,

10   "talked to the Senator [WILKERSON] this morning" and told her that the license was "all

11   set."

12       25. **Boston Licensing Board Awards Dejavu a Beer and Wine License**:

13   On August 16, 2007, the BLB issued a letter notifying Dejavu that its petition for a malt and

14   wine license had been granted. On the same day, WILKERSON met with the BLB

15   Chairman, the Senate President, the Boston City Council President, and Senator Y to

16   discuss the status of the Dejavu license and related issues. The outcome of the meeting was

17   an agreement that the City of Boston would submit, and WILKERSON would sponsor,

18   legislation which would authorize 40 new nontransferable liquor licenses and 30 new

19   nontransferable beer and wine licenses for the City of Boston. (This type of legislation is

20   also known as a "home rule petition.") It was understood that Dejavu would receive one of

21   these new special liquor licenses, if another one did not become available first, and that

22   WILKERSON would be able to control several other licenses.

23       26. **Boston Licensing Board Gets Pay Raise**: Approximately one week

24   after the Dejavu liquor license deal was struck by WILKERSON, on or about August 23,

25   2007, the Senate passed pending legislation authorizing an increase in the salaries of the

26   BLB, including its chairman (House No. 2012).

27       27. On August 30, 2007, the CW spoke with WILKERSON and told her: "I

28   have a little something for you. You've been doing a lot of heavy lifting lately." He also

11

told her that he wanted to introduce her to a young man with whom he was beginning to work. The young man, referred to herein as "UC1", was in fact an undercover FBI agent posing as an out of state businessman. WILKERSON agreed to meet with the CW and UC1 at the Fill-A-Buster restaurant the following day.

28. **Fourth Cash Payment at the Fill-A-Buster ($1,000)**: On August 31, 2007, the CW met with WILKERSON at the Fill-A-Buster restaurant on Beacon Hill in Boston. The meeting was surreptitiously audio and video recorded. WILKERSON brought along her grandchild. The CW told WILKERSON that UC1 could not make the meeting, but would like to meet her. WILKERSON said she was anxious to meet UC1 because she wanted him to look at some "business opportunities." At one point the child left the table and the CW handed WILKERSON $1,000 in cash. The CW said, "while she is gone, I just want to make sure. This is a thousand dollars. . . You're the only soldier that's been on our watch." WILKERSON explained that at her request Senator Y drafted language for the home rule petition for new liquor licenses and that the Boston City Council would vote on it in early September. She told the CW that he and his business partner should not have a problem getting a full liquor license. The CW told WILKERSON that she should, "take that thousand dollars and do something good. . . Knock yourself out. You earned it." WILKERSON responded that she was planning to go to the spa at Foxwoods that weekend. The cash taken by WILKERSON was in the following denomination: ten $100 bills. The serial numbers of the bills were recorded by the FBI.

29. **Wilkerson's Foxwoods Trip:** Records obtained from Foxwoods Resort Casino reveal that WILKERSON dined at a restaurant at the casino late on the night of August 31, 2007 and gambled at the casino on August 31, 2007 and September 1, 2007.

30. **FBI Undercover "UC1" Introduced**: On September 14, 2007, the CW introduced UC1 to WILKERSON at a luncheon meeting at the Parker House. The meeting was audio recorded. During that meeting WILKERSON explained that she had successfully engineered 40 new liquor licenses for the City of Boston. She stated that four of the licenses "are mine." The CW and UC1 explained that UC1 was a businessman from out of

1    state who was looking for business opportunities in Boston. In a wide-ranging conversation
2    about real estate development opportunities in Boston, WILKERSON expressed an interest
3    in assisting UC1 make contacts in the City.

4             31. On September 21, 2007, WILKERSON spoke again with the CW. She
5    told the CW that the home rule petition for the additional Boston liquor licenses was "on
6    the Mayor's desk" for signature.

7             32. **City Council Acts on New Liquor Licenses**: On or about September
8    19, 2007, a home rule petition to increase the number of liquor licenses in the City of
9    Boston was offered by the City Council President and designated Docket 1100. Docket
10   1100, captioned "Petition for a Special Law Re: Licenses for the Sale of Alcoholic
11   Beverages" called for legislation permitting the Boston Licensing Board to issue up to 40
12   additional licenses for the sale of all alcoholic beverages, among other things. On or about
13   September 26, 2007, Docket 1100 was passed by the Boston City Council with
14   amendments. On or about September 28, 2007, Docket 1100 was signed by the Mayor of
15   Boston.

16            33. **Wilkerson Introduces Liquor License Legislation in Senate**: On or
17   about October 3, 2007, WILKERSON spoke with the CW and told him that the home rule
18   petition for liquor licenses would take about two to three weeks to be introduced in the
19   legislature, passed, and presented for the Governor's signature. On or about October 9,
20   2007, WILKERSON introduced the language of Docket 1100 as Senate No. 2358, "An Act
21   Establishing Additional Licenses for the Sale of Alcoholic Beverages." The language of
22   Senate No. 2358 mirrored the language of Docket 1100, including the creation of 40 new all
23   alcohol licenses, among other things. On the same day, Senate No. 2358 was referred to the
24   Joint Committee on Consumer Protection & Professional Licensure chaired by Senator Y.

25            34. **Wilkerson Manipulates Timing of Senate Bill**: During September and
26   early October 2007, WILKERSON repeatedly told the CW that Dejavu needed to enter into
27   a binding lease in order to obtain final approval from the Boston Licensing Board and the
28   ABCC for a liquor license. During one recorded meeting between WILKERSON and the

13

1    CW on or about October 10, 2007, WILKERSON explained to the CW that she was
2    moving "fast/slow" on the passage of Senate No. 2358 because she wanted the CW to have
3    a lease, or letter of intent to lease, in hand when the new licenses became available.
4    WILKERSON told the CW that while she had "some leeway with [the BLB Chairman]" for
5    a limited period after the legislation passed, she could not hold a license for the CW for a
6    long period after the legislation passed. WILKERSON made clear that she was exercising
7    control over the passage of Senate Bill 2358 so as to time its passage with the CW's plans
8    to lease a location for Dejavu.

9         35. On or about October 19, 2007, the CW met with the lawyer obtained
10   through WILKERSON. The lawyer told the CW that the BLB Chairman had called him
11   and informed him that the BLB now had a full liquor license available. As recounted by the
12   lawyer, the BLB Chairman said, "I have one for 'em. I promised it to them and I have one
13   for 'em." The lawyer directed the CW to immediately get a lease for Dejavu so that the full
14   liquor license could be granted to Dejavu.

15        36. On or about October 31, 2007, the BLB held a hearing on Dejavu's
16   application for a full liquor license. At the time, Dejavu had not entered a lease for a club
17   location. Despite this, the liquor license was approved by the BLB. The same day, the CW
18   spoke with WILKERSON in a recorded telephone call. He told her: "I just want to give you
19   some good news. We got the license. And . . . I want to get together with you on Friday, if
20   that's possible. Have a little lunch. [UC1] is in town and I got a little, a little something for
21   you."

22        37. On or about November 1, 2007, the CW left a voicemail on
23   WILKERSON's telephone stating: "[UC1] and I just wanted to see you and to thank you for
24   your efforts in getting the license. And we got, you know, a little surprise for you. . . Not
25   too many people supported us on this and we just wanna come in and express our thanks."

26        38. **Fifth Cash Payment at the Fill-A-Buster ($3,000)**: On November 2,
27   2007, WILKERSON met with the CW and UC1 at the Fill-A-Buster restaurant on Beacon
28   Hill. The meeting was surreptitiously audio and video recorded. The CW explained that

14

1   the BLB Chairman gave Dejavu four to six months to complete the construction build-out.

2   WILKERSON responded, "You know, they never do that . . . you can't, you can't get a

3   license without, you know, he's [the BLB Chairman] . . . on his p's and q's right now." The

4   CW said that a license on the open market was worth $300,000 and expressed his

5   appreciation for all of WILKERSON's help. He also told WILKERSON that UC1's father

6   was now an investor in the Dejavu project. During the course of the conversation, the CW

7   handed WILKERSON $3,000 in cash and told her, "that's three thousand dollars."

8   WILKERSON took the money saying, "Okay. Thank you very much." The CW suggested

9   that WILKERSON take the money and "go to Foxwoods" or "just chill out. Buy a bottle of

10  good wine." Two still images from a video recording of the meeting are attached as

11  Exhibits G and H. Exhibit G shows the cash in the CW's hand before he provided it to

12  WILKERSON. Exhibit H shows WILKERSON's reaction after the CW paid her $3,000

13  and then told her, "when we get the license we are going to take care of you big-time." The

14  cash taken by WILKERSON was in the following denominations: twenty-five $100 bills

15  and ten $50 bills. The serial numbers of the bills were recorded by the FBI.

16          39. **Wilkerson's "Arm Twisting" and "Knee Cracking"**: Between

17  November 2007 and January 2008, as part of the undercover operation the CW was

18  instructed by the FBI to limit his contacts with WILKERSON and others involved in the

19  Dejavu project. In a recorded call on January 8, 2008, between UC1 and WILKERSON,

20  WILKERSON told UC1 that the CW had dropped out of sight. UC1 said that he had not

21  spoken to the CW in a number of weeks and that he had only gotten involved in the Dejavu

22  project because of his father's connection with the CW. UC1 added that he had been

23  unimpressed with the CW's ability to construct and open Dejavu. WILKERSON expressed

24  similar dissatisfaction with the CW. She told UC1 that she had slowed down the legislative

25  process on Senate No. 2358 to insure that Dejavu got a license: "I slowed the process down

26  . . . the licenses have been sitting . . . in committee. I have told the committee that . . . I'll

27  let them know when I want them to take the vote. Because once I do that and they go to the

28  City, they're just gonna be gone." WILKERSON noted that "at the very least, somebody

owes me an explanation" for the CW's failure to move forward. WILKERSON explained to UC1 that in her efforts to get Dejavu a license, "I pushed this envelope farther than it's ever been pushed before." She boasted of the "people's who's knees I had to crack" and "I twisted these people's arms . . . I've been beating people up." She talked of "call[ing] in chits with the Mayor [and] the Licensing Commission. And, even going so far as to get a licensing board to approve a license for a[n] . . . entity which doesn't have a location, which has never been done." WILKERSON said that she had "the sixty licenses" on hold and was owed an explanation. UC1 distanced himself from the Dejavu project and then asked for WILKERSON's advice on other opportunities in Boston. WILKERSON agreed to meet with UC1 about those opportunities.

40. **Wilkerson's Delay of Senate Bill**: On or about January 16, 2008, UC1 met with WILKERSON at her State House office. The meeting was audio recorded. At the outset of the meeting UC1 introduced a second FBI undercover agent posing as another out-of-state businessman. This undercover is referred to herein as "UC2." During the course of the meeting, UC1 told WILKERSON that he was considering taking over the development of the Dejavu Club from the CW. He asked WILKERSON if she could hold up the liquor licensing legislation for another four weeks. WILKERSON responded that she could do so because she was "sitting on the . . . committee" handling the legislation. As outlined below, WILKERSON then sought UC1's involvement in several business deals including the development of a piece of state property (Parcel 8) on Harrison Avenue in Roxbury.

41. **Sixth Cash Payment by Undercover at the Fill-A-Buster ($2,000)**: On or about March 12, 2008, UC1 met with WILKERSON in her State House office. The meeting was surreptitiously audio and video recorded. After exchanging pleasantries, UC1 asked WILKERSON if they could save five minutes at the end of their meeting to walk across the street to "grab a cup of coffee." This was intended to signal to her that he had a payment for her. She agreed. UC1 thanked WILKERSON for holding up the liquor license legislation while he explored the feasibility of taking over the plans to develop Dejavu. UC1 told WILKERSON that the Dejavu project was not economically feasible as conceived

16

by the CW and he would not be investing in it. However, UC1 also stated that his group of investors recognized the value of a liquor license and inquired whether WILKERSON could continue to hold the legislation and earmark one of the licenses for a project that he and UC2 might develop. WILKERSON said that she could do so depending on the location. (The pending legislation, Senate No. 2358, limited the issuance of new licenses to specific areas in the City of Boston.) UC1 told WILKERSON that it was part of his marching orders from UC2 to see if she could continue to "hold up" a liquor license for them while they scouted potential locations for its use. WILKERSON agreed to do so. During the conversation, UC1 and WILKERSON walked from the State House to the Fill-A-Buster restaurant. Once there, UC1 thanked WILKERSON for her efforts on his behalf, particularly holding on to the liquor license while he evaluated the Dejavu project. WILKERSON responded, "Yeah, it was a bit of a challenge but we, we're working on it." UC1 went on to note, "that liquor license for us . . . that's valuable," and reiterated his desire that she continue to hold it for him and UC2. UC1 then slid a white envelope containing \$2,000 in cash across the table to WILKERSON saying it was in appreciation for her efforts. She responded, "oh, thank you" and took the envelope. Shortly afterwards, she folded the envelope with cash and put it in her pocket. Two still images from a video recording of the meeting are attached as Exhibits I and J. Exhibit I shows WILKERSON sitting in the Fill-A-Buster just prior to the payment. Exhibit J shows WILKERSON with the white envelope containing the cash payment in hand. The cash taken by WILKERSON was in the following denomination: twenty \$100 bills. The serial numbers of the bills were recorded by the FBI. Later the same day, UC2 met separately with WILKERSON in her State House office. The meeting was audio recorded. UC2 told WILKERSON that a liquor license was a great opportunity for him and UC1, and told WILKERSON that he was responsible for half of the "proposal" (\$2,000 payment) UC1 gave her that morning. WILKERSON responded that, "the sooner you find a place [for the liquor license] . . . the better. I told him [UC1], you know, I, I don't have a year." As outlined below, UC2 also spoke with WILKERSON about the development of a piece of land on Harrison Avenue in

17

1    Boston and the related direct designation of a piece of state land (Parcel 8) to a private

2    entity developing the project.

3                  42. On April 2, 2008, WILKERSON met with UC2 and UC1 at Mooo . . .

4    Restaurant on Beacon Hill in Boston. The meeting was audio recorded. WILKERSON told

5    them that she was holding on to the liquor license legislation until they had a plan in place

6    to use one of the new licenses. WILKERSON explained that the deal she had struck

7    regarding the legislation was that five of the new liquor licenses were to be set aside for

8    Roxbury and that she could control those five licenses. She encouraged UC1 and UC2 to

9    have a plan for the use of a license by July 31st because that was the end of the legislative

10    session. She said after that point she would have less ability to keep a hold on the

11    legislation. WILKERSON noted that the licenses were "worth too much money" to let slip

12    away to others.

13           **PARCEL 8: CASH BRIBES FOR DIRECT DESIGNATION LEGISLATION**

14                  43. **Wilkerson Pitches Parcel 8 to Undercovers**: At an audio recorded

15    meeting in her State House office with UC1 on January 16, 2008, WILKERSON proposed

16    that UC1 and UC2 get involved in the development of a parcel of land in Roxbury at the

17    corner of Harrison Avenue and Melnea Cass Boulevard. WILKERSON told UC1 that the

18    property available for development included a large hardware store, which was seeking to

19    be bought-out, and an abutting piece of property owned by the Commonwealth of

20    Massachusetts. In subsequent conversations with UC1 and UC2, WILKERSON identified

21    the land as "Parcel 8". WILKERSON told UC1 that a man referred to herein as "Associate

22    A" had a contractual relationship with the owners of the hardware store to develop the

23    property and that Associate A was first in line for developing the property. WILKERSON

24    went on to tell UC1 that Associate A needed more "talent and muscle" to develop the

25    property and might be willing to sell his rights to UC1 and/or UC2.

26                  44. On the morning of March 12, 2008, UC1 met again with WILKERSON

27    at her State House office. The meeting was audio recorded. At that meeting UC1 told

28    WILKERSON that he had a client who was very interested in participating in the Harrison

Avenue development. WILKERSON suggested that the next step would be to introduce UC1 to Associate A. When UC1 noted that he would only be interested in the development if it included both the property owned by the hardware store (Harrison Supply) and the Commonwealth's adjoining Parcel 8, WILKERSON responded that she was prepared to "do a direct designation" of the state property to the developers. WILKERSON explained in a subsequent recorded conversation that a "direct designation" is a piece of state legislation which authorizes the Commonwealth to sell a piece of real property to a particular person or entity designated in the legislation without the property being sold through a competitive bidding process. UC1 told WILKERSON that he and UC2 were viewing the Harrison Avenue project as being "our first project to get us involved in the Boston area." As noted above, it was at this meeting that UC1 also paid WILKERSON a $2,000 bribe for her agreement to stall the liquor license legislation and hold a license for him.

45. On the afternoon of March 12, 2008, UC2 met with WILKERSON at her State House office. The meeting was audio recorded. During that meeting, WILKERSON told UC2 that the whole block around Harrison Supply was available for development, including the parcel owned by the state. She also told UC2 that other individuals were interested in developing Parcel 8 for other purposes, but that she had been able to "freeze" it for Associate A so that he could develop it in connection with the Harrison Supply property. In this and other meetings and calls with UC2 and UC1, WILKERSON repeatedly noted that Associate A did not have the talent or funding sufficient to move forward on the project and that is why she was seeking their involvement. She reiterated her plan to directly designate Parcel 8 when Associate A was ready to develop the entire property. WILKERSON provided UC2 her cellular telephone number and encouraged him to call her.

46. **Meeting at Mooo . . .**: On April 2, 2008, WILKERSON met with UC2 and UC1 at Mooo . . . Restaurant on Beacon Street in Boston. The meeting was audio recorded. WILKERSON spoke in detail about the Harrison Avenue development and said that there was "an opportunity" in connection with Parcel 8. WILKERSON again noted she

19

could file legislation directly designating the property to the developers which meant, "you don't have to get into a bidding process." She also said that Associate A had approached "elected officials" about developing a combined site comprised of Parcel 8 and the Harrison Supply property. During the course of their conversation, Associate A arrived at the restaurant and WILKERSON introduced him to UC2 and UC1. Associate A sought to recruit UC2 and UC1 to work on the Harrison Supply/Parcel 8 project with him. Associate A said, "I need someone like you guys at the table" in order to get the direct designation of Parcel 8. (Associate A said in a subsequent telephone call on May 15, 2008, that he had a lot of development projects to pursue but not the money to move forward.) WILKERSON said that for her to introduce direct designation legislation, she needed "a project" and "a proposal." WILKERSON also said that UC2, UC1, and Associate A would need "letters of support" to be used in Senate deliberations. Associate A said he was not interested in being bought out; he wanted a role of a junior partner in the development, which he anticipated would have a value of $100 million. UC2 said they needed to speak with their investors before moving forward.

47. On May 18, 2008, WILKERSON spoke with UC2 on the telephone. The call was recorded and was an interstate communication. In the call, WILKERSON talked about Associate A, again noting her doubts about his capabilities as a leader for the development of the Harrison Avenue property. In the course of the call, UC2 invited WILKERSON to Atlanta to meet developers and an investor. UC2 told WILKERSON that if she would meet them in Atlanta, it "will give [him] a lot of mileage with these guys." WILKERSON responded, "we'll make that work."

48. On May 28, 2008, UC2 met with WILKERSON at her State House office. The meeting was audio recorded. At the outset of the meeting WILKERSON provided UC2 with a written proposal regarding the Harrison Avenue property which she said had been prepared by Associate A. WILKERSON expressed skepticism that Associate A could carry through with the project and encouraged UC2 to be involved. She also said that she had prevented the State from leasing Parcel 8 to an interested business. UC1 joined

them in mid-meeting. After discussing possible tenants for a development on the Harrison Avenue property, WILKERSON told UC2 and UC1 that she had spoken with the Chief of Staff for the Secretary of the Department of Conservation and Recreation; that Department holds title to Parcel 8. She said that she made it "really clear" to him that legislative authority would be used to directly designate Parcel 8. She also expressed an interest in filing the direct designation legislation by July 31, 2008. She encouraged UC2 and UC1 to join with Associate A to get letters of support from other elected officials for a direct designation of the state property. WILKERSON also suggested that Associate A travel with her to Atlanta, so that they could both meet with UC2, UC1, and their potential developers and financial backers there. UC2 agreed to move forward on planning the trip for WILKERSON and Associate A to travel to Atlanta.

49. On June 18, 2008, UC2 again met with WILKERSON in her State House office. The meeting was audio recorded. Again, WILKERSON encouraged UC2 to put a team together with Associate A for the development of the Harrison Avenue property. She again expressed her skepticism about Associate A's abilities. She invited UC2 to a fund raising event that evening being held for her at the Bostonian Hotel. She said she could introduce UC2 to many of the major developers in the City of Boston at the fund raiser. At WILKERSON's request, UC2 attended her political fund-raiser that night and contributed $500.00 by money order to her campaign. (The money order provided by UC2 to WILKERSON's campaign on June 18, 2008 is the only payment made by the CW, UC1, or UC2 to WILKERSON which appears on WILKERSON's campaign disclosure forms filed with the Massachusetts Office of Campaign and Political Finance.)

50. On June 20, 2008, UC2 called WILKERSON to confirm a scheduled meeting on June 26, 2008. UC2 left a message saying he had "a proposal on parcel number eight that I wanted to go over with you."

51. **Seventh Cash Payment at the Fill-A-Buster ($5,000)**: On June 26, 2008, WILKERSON met with UC2 at her State House office. The meeting was audio recorded. After discussing some meetings that WILKERSON had set up for UC2 with

21

Boston businessmen, UC2 told WILKERSON that he had found an investor to fund a portion of the Harrison Avenue project. He then told WILKERSON that he had "the proposal to give you on that," and suggests they grab a cup of coffee somewhere else. (Again, this was intended to signal to her that he wanted to deliver cash for her assistance.) WILKERSON responded, "Yeah." UC2 then told WILKERSON that he wanted to put the investor in touch with Associate A. At WILKERSON's suggestion, she and UC2 then left her State House office and walked to the Fill-A-Buster eatery on Beacon Hill. While at the Fill-A-Buster, UC2 handed WILKERSON two envelopes of cash. The first envelope, containing $3,000 in cash, had "Proposal for Harrison Towers" written on it. As he handed her the first envelope, UC2 told WILKERSON, "that's for Harrison Towers." "Harrison Towers" was the working name for the project on the Harrison Avenue/Parcel 8 property. UC2 said, "my guy wants that parcel." The second envelope, containing $2,000 cash, had "ATL" written on it. UC2 told WILKERSON that it was for the upcoming trip to Atlanta. With respect to the Parcel 8 project, UC2 asked for WILKERSON's assistance in putting the direct designation in his investor's name. WILKERSON replied that if Associate A agreed to putting it in the investor's name, she could draft the legislation to do it. The investor, referred to herein as "UC3", was another FBI undercover agent posing as an out of state real estate developer. Immediately after leaving the Fill-A-Buster, UC2 accompanied WILKERSON back to her State House office, where she checked her calendar and scheduled the trip to Atlanta for July 18, 2008. WILKERSON also agreed to talk to Associate A about directly designating Parcel 8 to UC3. The cash taken by WILKERSON at this meeting was in the following denomination: fifty $100 bills. The serial numbers of the bills were recorded by the FBI. The portion of the meeting between UC2 and WILKERSON which took place at the Fill-A-Buster was also captured by agents operating an audio/video recording device. Two still images from a video recording of the meeting at the Fill-A-Buster are attached as Exhibits K and L. Exhibit K shows WILKERSON about to sit down at the table with UC2 just prior to the payment. Exhibit L shows Wilkerson leaving the Fill-A-Buster with the two envelopes of cash in her left hand. UC2's image has

22

been redacted from both exhibits.

52. UC2's $5,000 payment to WILKERSON prompted a flurry of telephone calls and meetings. The next day, June 27, 2008, WILKERSON left a voicemail message for UC2. She told him that she "is sitting here with [Associate A]" and told him about her conversation with UC2 from the day before. She asked for a call back to discuss the "next step." Later the same day, Associate A left a message for UC2 expressing interest in UC3 as a partner. That evening UC2 and Associate A spoke on the telephone. Associate A pressed UC2 to include UC3 as the primary financier of the project. Associate A also told UC2, "the [legislative] session is going to close [at] the end of July . . . The Senator [WILKERSON] told us to please bring in something before the session closes. She's going to take that to the floor." Associate A also told UC2 that, "the Senator [WILKERSON] is very, very supportive of you and I understand that very well." UC2 then spoke with WILKERSON late that night. WILKERSON told UC2 that Associate A asked WILKERSON to designate Parcel 8 to Associate A's company. WILKERSON declined to do so and suggested that the property be put in UC3's name. However, she told Associate A that he should work with UC3 and UC2 to decide the details of the name of the entity to receive Parcel 8.

53. On July 7, 2008, WILKERSON left a voicemail message for UC2. The call, which was recorded, was an interstate communication. She told him she had been to a Roxbury Master Planning Oversight Committee ("RMPOC") meeting that evening and that Parcel 8 was discussed. She said the RMPOC asked to meet with the proposed development team. She asked UC2 to call her back regarding the next step on Parcel 8 and other matters.

54. Between July 7 and 11, 2008, WILKERSON and UC2 swapped numerous voicemail messages. On July 11, 2008, UC2 successfully returned WILKERSON's call. The calls were interstate communications. WILKERSON encouraged UC2 to attend the upcoming meeting of the RMPOC and to participate in a presentation about the development of Parcel 8. She also said that the direct designation

23

1  would need to be a joint designation to Associate A and UC3. UC2 asked whether he
2  would need to garner any support for the direct designation from members of the
3  Massachusetts House of Representatives. WILKERSON responded that he would need to
4  obtain the support of a specific member of the Massachusetts House of Representatives
5  referred to herein as "House Representative Z." During the conversation UC2 asked, "the
6  proposal that I gave you [referring to the cash on June 26, 2008], . . . is that everything that
7  you need? Because I got, I got [UC3] set up to do whatever it takes to move forward."
8  WILKERSON responded, "Oh yeah, I'm fine . . . I mean . . . as this thing develops, we'll
9  have a, we'll have a conversation. But of right now, I'm doing what I told you what I would
10  do." They also talked about her plans to meet with UC2 and others in Atlanta on July 18,
11  2008.

12            55. **Delivery of $ 959 Airline Ticket**: On or about July 11, 2008 UC2
13  offered to purchase a round-trip airline ticket to Atlanta for WILKERSON. WILKERSON
14  accepted and provided UC2 an e-mail address to send the e-ticket:
15  "senwilkerson05@aol.com." The following day, on or about July 12, 2008, UC2 purchased
16  the e-ticket at a cost of $ 959, and forwarded it to WILKERSON by e-mail at her address
17  "senwilkerson05@aol.com." The e-mail to WILKERSON was an interstate communication.

18            56. On or about July 17, 2008, WILKERSON's State House Chief of Staff
19  left a voicemail message for UC2. She said that WILKERSON could not make the trip to
20  Atlanta on July 18 because of an ongoing formal session at the State House.
21  WILKERSON's chief of staff suggested that they change the date one week, as
22  WILKERSON wanted to meet with UC2 and others in Atlanta on July 25, 2008.

23            57. Between July 18, 2008 and July 22, 2008, a series of voicemails and
24  telephone calls were swapped between WILKERSON's Chief of Staff and UC2, as well as
25  WILKERSON and UC2, regarding WILKERSON's proposal to come to Atlanta on July 25,
26  2008. The calls were interstate communications.  Ultimately, UC2 declined
27  WILKERSON's offer to come to Atlanta on July 25th in a call with WILKERSON on July
28  22, 2008. He did so because he could not reschedule the meetings he had set up for her the

24

week before.

58. **Wilkerson's "110 % Commitment"**: On the afternoon of July 23, 2008, WILKERSON spoke with UC3 in a recorded call. The call was an interstate communication. She outlined for him her support of directly designating Parcel 8 to a partnership or joint venture between UC3 and Associate A. UC3 asked about the nature of the direct designation legislation. WILKERSON told him she believed she could provide him a draft within several days. She also assured UC3 that she was committed "a hundred and ten percent" to the direct designation legislation. UC3 noted that, "It will be worth all of our whiles at the . . . end of the day." WILKERSON told UC3 not to worry about the July 31, 2008 date for the end of the legislative session. She told him that the legislation could be passed during the informal session between August and December. WILKERSON also told UC3 that, "we have since secured the support of the Assistant Majority Leader of the House . . . who happens to be . . . a State Rep. And I am his Senator." WILKERSON also said she could not come to Atlanta the previous week because of Senate work. However, she said she was available to come to Atlanta to meet UC3 and discuss the legislation on July 25.

59. **"I did my job"**: Later on July 23, 2008, WILKERSON spoke with UC2 in a recorded telephone call. The call was an interstate communication. She confirmed that she had spoken directly with UC3. UC2 responded that UC3 was now "excited" about the project. WILKERSON said, "Oh good. Then I did my job." UC2 confirmed that he was unable to reschedule the Atlanta meeting for July 25th. WILKERSON responded that she would then be unavailable for an Atlanta trip until after the primary in mid-September.

60. Later that same evening WILKERSON sent an e-mail to UC2 and UC3 using the following e-mail account: wdeewee@aol.com. The e-mail was an interstate communication. WILKERSON's e-mail was also copied to her State House e-mail account: Dianne.Wilkerson@state.ma.us. Attached to that e-mail were two samples of direct designation legislation. The e-mail also revealed that one of her State House staffers

25

1    had forwarded the material to her from his e-mail address. WILKERSON explained that

2    she had not drafted legislation yet for Parcel 8: "You don't have a draft for Parcel 8 only

3    because I have not received from the state the legal description." WILKERSON also wrote,

4    "I continue to stand ready to provide whatever additional information you might need. . . I

5    am a firm believer in the notion that you can do good and do well at the same time."

6           61. On or about August 12, 2008, UC2 spoke to WILKERSON by

7    telephone. The call was an interstate communication. They discussed plans for UC2 to

8    come to Boston to introduce WILKERSON to UC3. In that call he told WILKERSON that

9    UC3 wanted confirmation from her of the $3,000 payment that had been made to her for

10   Parcel 8. WILKERSON agreed.

11          62. **Cash Payments "Very Much Appreciated"**: On August 14, 2008,

12   UC2 and UC3 met with WILKERSON outside her district office on Tremont Street in

13   Boston, Massachusetts. The meeting was audio recorded. She again outlined the legislative

14   process for directly designating Parcel 8 to the joint venture and said she had drafted

15   legislation on their behalf. She also told them that she had spoken to House Representative

16   Z to get his support for the project. She also said that Associate A had met with House

17   Representative Z to get his support. WILKERSON said that as soon as there is an

18   agreement between UC3 and Associate A regarding a name for their joint venture, she

19   would file the direct designation legislation in the Senate and House Representative Z

20   would file it in the House. She outlined how she would shepherd the legislation through the

21   Senate including the Joint Committee on State Administration and Regulatory Oversight,

22   which she co-chairs. She also said that the designation could be accomplished during the

23   informal legislative session. When WILKERSON was asked by UC3 whether "[UC2]'s

24   been taking care of you," (referring to the $3,000 and $2,000 bribes paid on June 26, 2008),

25   WILKERSON responded, "Sure has. And believe me, they're very, very, very much a-, a-,

26   appreciated." UC3 told WILKERSON that if she needs anything more she should tell UC2.

27   WILKERSON responded, "Wonderful. Thank you."

28          63. **"Associate A" Outlines Politician Payment Plan**: Later in the day on

26

August 14, 2008, UC2 and UC3 met with Associate A to discuss the details of the joint venture and to determine whose support would be necessary to obtain title to Parcel 8. The meeting was audio recorded. UC2 and UC3 asked Associate A whether anyone needed to be paid to obtain their support. Associate A confirmed that WILKERSON's support was most important and the most expensive: "the biggest chunk that we gotta worry about is the Senator . . . this woman is extremely powerful. . . If she say no, you're fucking dead. If she say yes, you're golden." Associate A went on to explain that House Representative Z's support was also important and that, "[House Representative Z] is, is small. Five thousand to [House Representative Z]." Associate A also explained that WILKERSON "orchestrates" the "small timers" including a second named member of the House of Representatives and a named Boston City Councilor. Associate A suggested that each of those individuals should be paid $1,000. Associate A agreed to make introductions to the relevant politicians so that UC2 or UC3 could make payments to them. However, Associate A cautioned, "ninety-nine percent of the times, these people would, would accept or receive these things from a source that they're comfortable with."

64. **Wilkerson Loses Democratic Primary:** On September 16, 2008, WILKERSON lost in a close primary election race for the Democratic nomination for her Massachusetts Senate seat, the Second Suffolk District. WILKERSON subsequently requested a vote recount in several precincts, which was undertaken and did not change the result. WILKERSON then declared that she intended to run in the general election as a write-in candidate for her senate seat. (Write-in campaigns are also called "sticker campaigns," because stickers with the candidate's name on them are given to voters to affix on the ballot.)

65. **Wilkerson Presses "UC2" for $10,000:** On the evening of September 24, 2008, UC2 called WILKERSON to discuss the election results and her efforts to move forward with legislation directly designating Parcel 8. WILKERSON told UC2 that she "definitely need[s] to speak with you" but was in a meeting and would call him back. She said, "I want to talk to you specifically about what I need you to do." WILKERSON called

27

UC2 approximately two hours later and left a message asking him to return her call. When UC2 returned the call shortly thereafter, WILKERSON told him of her close loss in the primary and her intention to run a write-in/sticker campaign. She told him that she needed to raise $60,000 - $70,000 for this effort and she could not do it through $500 or $250 donations. (Under Massachusetts campaign finance laws, candidates are prohibited from accepting more than a total of $500 per year from any individual, and prohibited from accepting more than $50 in cash per year from any individual.) She told UC2 that she was raising cash, "so that I can use it as we see fit." She explained that the only way she would win is if she raised the money. UC2 said, "I've been talking to a couple of my clients about this. The investment that I have already is worth nothing unless . . . you win."

WILKERSON responded, "I hope you can impart that to them. Obviously . . . [Associate A] and all of the folks are in big time." WILKERSON explained that she had already raised $35,000 in a short time and said "whatever you can do, I'm telling you, would be a huge help." When UC2 asked WILKERSON to give him a figure she responded, "I would say ten." UC2 indicated that the first people he would be seeking the money from was from UC3 and his family, and asked if she would have time to move the direct designation legislation forward. WILKERSON responded, "I'm on a tear to get it done . . . before November. . . I'll make sure that you get . . . that language." When UC2 asked how he should get money to WILKERSON, she told him she could accept checks made out to her personally up to $10,000 if nothing was expected in return. Alternatively, she explained, "if it's, obviously, the way you did it before, then that's not an issue at all because that just means cash." UC2 agreed to put the money together from his contacts out of state and meet with her the next week. He also asked her to provide a draft of the legislation when she had the opportunity. Each of the calls that evening were interstate communications.

66. **Wilkerson Prepares Draft Legislation**: On or about September 29, 2008, UC2 called WILKERSON to confirm his intention to come to Boston and provide her with $10,000 in exchange for the direct designation legislation. The call was recorded and was an interstate communication. She told him that her fund raising efforts were continuing

28

and that in addition to $35,000 the she had raised before their last call, she had raised another $12,000. UC2 said he would like to meet with her in three days. WILKERSON said she had prepared a final draft of the legislation and was making efforts to get House Representative Z to introduce the legislation in the House. She explained that it would be a long term lease of the property. UC2 asked her to introduce him to House Representative Z so he could assure his clients that even if she lost in the general election, someone would be pushing the legislation. WILKERSON agreed to try to set up the meeting. UC2 said that if he could get a meeting with House Representative Z and "move the introduction of the designation [legislation] up . . I can do five and five on Thursday." WILKERSON responded, "we're trying to . . . expedite it and the only hitch right now is [House Representative Z]. . . I want him signed-on on the House side." They then agreed to meet on October 2, 2008.

67. At approximately 1:40 a.m. on October 1, 2008, WILKERSON left a voicemail message for UC2. The call was an interstate communication. In that message she said that she was preparing to introduce the direct designation legislation "tomorrow." She sought UC2's confirmation that the terms of the legislation were in keeping with his desires: "I don't want to misunderstand about what it is we're supposed to do." Later on October 1, 2008, UC2 sent WILKERSON an e-mail to her accounts at: Senwilkerson05@aol.com, Dianne.Wilkerson@state.ma.us, and wdeewee@aol.com. The e-mail was an interstate communication. In that e-mail, UC2 gave his concurrence to the introduction of the direct designation legislation as proposed by WILKERSON in her voicemail message. UC2 also said that he planned to meet with her on the following day, October 2, 2008, to "provide you with the proposal that we discussed last week [referring to her request for $10,000]." UC2 also sought confirmation that WILKERSON was arranging for him to meet with House Representative Z.

68. **Wilkerson Collects $10,000 in Cash, Provides Copy of Legislation**: On October 2, 2008, UC2 met with WILKERSON outside her district office on Tremont Street in Boston, Massachusetts. They walked across the street to Ali's Roti Wraps and

29

Take-Out Restaurant ("Ali's"). As they entered the restaurant, UC2 asked, "did you file it?" WILKERSON replied, "yes, it got filed." During the course of the conversation WILKERSON explained that she had been lobbying House Representative Z to introduce the direct designation legislation in the House and that she told House Representative Z that she had "made a commitment" to file it. She said that he agreed to file the legislation in the House but would want some form of public hearing. Later in the conversation UC2 showed WILKERSON a leather day planner which contained $10,000 in cash for her. He opened it up and showed her the cash, which consisted of ninety $100 bills and twenty $50 bills. UC2 said, "that's ten." He explained, "its ten and its for the designation. . . Its for the work that you did to get us to this point and then the work that we need you to do from this point forward." WILKERSON responded that she was "laser focused" on the direct designation legislation and reassured UC2 that the process would keep moving. She told UC2 that her State House staff was still working on it, and confirmed that there were files in her State House office related to the legislation. UC2 handed WILKERSON the $10,000 in cash, which she removed from the leather day planner and placed in a plain manila folder that she had been carrying. UC2 said, "that's a lot of money." WILKERSON laughed in response. UC2 thanked her again and WILKERSON talked about the work she planned to do for him in the future, including talking to the Boston Redevelopment Authority ("BRA"). WILKERSON also provided UC2 a copy of the direct designation legislation which she said had been recently filed. The serial numbers of the U.S. currency taken by WILKERSON were recorded by the FBI.

69. **Wilkerson Confirms Filing, Lobbies BRA**: On the afternoon of October 21, 2008, UC2 met with WILKERSON at her district office on Tremont Street in Boston to confirm the efforts she was making on his behalf. WILKERSON suggested that they leave the office and the two walked across the street to Ali's. During the course of their conversation WILKERSON assured UC2 that she had filed the direct designation legislation as she had agreed. She placed a call to one of her staff members in the State House to confirm the filing and to obtain from him the Senate docket number assigned to it.

1 | She also directed the staff member to e-mail the legislation from her State House office to
2 | her with a copy to UC2. (Shortly thereafter, the staffer e-mailed the legislation to
3 | Wilkerson at wdeewee@aol.com, with a copy to UC2.) WILKERSON explained that the
4 | legislation also needed to be filed in the House of Representatives and that she had a "deal"
5 | with House Representative Z. She explained that before House Representative Z filed the
6 | bill in the House, he wanted a community meeting about the proposed development.
7 | WILKERSON told UC2 that she had made efforts to set up that community meeting.
8 | Among other things, she said she contacted both a senior planner at the BRA and the
9 | Director of the BRA in an effort to set up the meeting; she said she wanted the meeting to
10 | be co-sponsored by the BRA. She also suggested that UC2 meet with House Representative
11 | Z as a team with Associate A.

12 | 70. **Senate Clerk Confirms Filing:** After meeting with Wilkerson on
13 | October 21, 2008, UC2 placed a telephone call to the Massachusetts Senate Clerk's Office.
14 | The clerk confirmed that Wilkerson had filed the legislation and also advised that the matter
15 | had been "referred to the Committee on Joint Rules."

### CONCLUSION

17 | 71. Based on the information set out above, I believe probable cause exists
18 | to conclude that from on or about May 2007 through on or about October 27, 2008:
19 | DIANNE WILKERSON did knowingly and willfully attempt to affect interstate commerce
20 | and the movement of articles and commodities in interstate commerce by extortion, in that
21 | DIANNE WILKERSON unlawfully obtained cash payments, which payments were not
22 | legally due to her or her office, and the consent of the payer having been induced under
23 | color of official right in violation of Title 18 U.S.C. §1951; and DIANNE WILKERSON
24 | did knowingly devise and execute a scheme and artifice to defraud and deprive the citizens
25 | of the Commonwealth of Massachusetts and the Massachusetts Senate of their right to the
26 | fair and honest services of DIANNE WILKERSON as a Senator in the General Court, and
27 | for the purpose of executing that scheme and artifice, WILKERSON did knowingly transmit
28 | and cause to be transmitted signs, signals, and sounds by means of wire communication in

31

interstate commerce, in violation of 18 U.S.C. §§1343 and 1346.

Krista L. Corr
Special Agent
Federal Bureau of Investigation
Boston, Massachusetts

Subscribed and sworn to before me this 27 day of October

Timothy S. Hillman
United States Magistrate Judge

32