UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 08-10345-DPW |
| ) | |
| DIANNE WILKERSON ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT DIANNE WILKERSON'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR A CHANGE OF VENUE**

**Introduction**

Defendant Dianne Wilkerson was arrested at 7:43 a.m. on October 28, 2008 – just one week shy of the election in which she was defending her seat as the only black senator in Massachusetts – and taken from her home, in handcuffs, to the United States Courthouse to face charges on eight counts of extortion, in violation of 18 U.S.C. §1951, and wire fraud/theft of honest services, in violation of 18 U.S.C. §§1343 and 1346. It is undisputed that Ms. Wilkerson posed no danger to the community, nor any risk of flight.

By that point, the press wheels at the United States Attorney's Office had already begun rolling: the Public Information Officer (PIO), Christina DiIorio-Sterling, was provided with a copy of the criminal complaint against Ms. Wilkerson, and then-U.S. Attorney Michael Sullivan instructed her to prepare a press conference. Document No. 94, Exhibit 2 (Affidavit of Ms. DiIorio-Sterling at ¶4). At 9:15 a.m., the office released to the media a copy of the complaint and accompanying 32-page affidavit, to which the government attached color photographs depicting Ms. Wilkerson allegedly accepting bribes. See id. at ¶6. The government also took care to include the most potentially embarrassing among these photographs: an image of Ms.

Wilkerson allegedly hiding money in her brassiere.  These images – and, in particular, the latter-described image – were then splashed across television, newspapers and magazines statewide.  By 9:30 a.m. that day, Mr. Sullivan was talking to the media, calling the accusations against Ms. Wilkerson "unconscionable" and declaring that "the citizens of the Commonwealth deserve honest and faithful services of their elected representatives – uncompromised by secret payments of cash."  Document No. 94 (remarks of Michael Sullivan).

And thus it began.  Ms. Wilkerson was branded by the U.S. Attorney, and the press, as guilty before the grand jury had even returned an indictment against her, and in the months following, dozens of stories would appear in newspapers and on television depicting Ms. Wilkerson as "self-serving," "pathetic," "incorrigible," and – thanks to the government's highly inappropriate and calculated release of gratuitous color photographs – a "bra-stuffing bribe-taker."  See Exhibit A.[1]  Under these circumstances, the indictment must be dismissed.  In the alternative, because Ms. Wilkerson cannot possibly receive a fair trial in Massachusetts in the wake of such unprecedented prejudicial pretrial publicity, a change of venue must be granted.

**Argument**

**I.   The Defendant was Prejudiced by the Government's Outrageous Conduct, Such That Dismissal of the Indictment is Required.**

"A district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation."  United States v. Barrera-Moreno, 951 F.2d 1089, 1091 (9th Cir. 1991) (citation omitted).  Such a violation occurs if the

---

[1] Exhibit A is a collection of *Boston Globe* and *Boston Herald* articles regarding Ms. Wilkerson's arrest and the charges against her.  It is not an exhaustive sampling of media coverage, however.

government's conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice."  Id. at 1092, quoting United States v. Restrepo, 930 F.2d 705, 712 (9th Cir. 1991).

Here, the government intentionally and irreparably tainted the jury venire by first staging a dramatic – and unnecessary – arrest, then releasing to the media a 32-page complaint affidavit and accompanying color photographs detailing Ms. Wilkerson's alleged crimes, while then-U.S. Attorney Sullivan all but declared her guilty in an inflammatory press conference the same morning.  This amounts to the type of "outrageous government conduct" warranting a dismissal.

First, the arrest: Ms. Wilkerson was intentionally made a public spectacle by the government, escorted from her home and to the United States Courthouse in handcuffs.  Such an arrest was, as this Court has already opined, "improper . . . [when] the defendant cannot reasonably be said either to pose a threat to the community or a risk of flight."  Transcript of July 2, 2009 Motion hearing (hereinafter "Tr.") at 20.  Notably, the government has chosen *not* to arrest other politicians facing serious charges,[2] such as former Speakers Thomas Finneran and Salvatore ("Sal") DiMasi.[3]  In fact, DiMasi's attorney received a courtesy call informing him that DiMasi was likely to be criminally charged – DiMasi was then able to turn himself in and avoid a humiliating public scene.[4]  "Arresting images," *Boston Globe*, June 5, 2009.  The government's choice to nevertheless carry out Ms. Wilkerson's arrest in such a manner speaks

---

[2] Where, arguably, similar "concerns" regarding the destruction of documents and other evidence such as the concerns the government voiced in the instant case would likely have existed.

[3] Defendant does not mean to imply that either Speaker should have been arrested; rather, their cases were handled appropriately, whereas Ms. Wilkerson's was handled entirely *inappropriately*.

[4] Nor did the U.S. Attorney publicly condemn Mr. DiMasi's alleged actions in the way Ms. Wilkerson was condemned.

3

volumes about its intent to taint the jury pool from the inception of the case. Indeed, statistics have shown that "African-Americans are under-represented in the jury venire in the Eastern District of Massachusetts, by as much as half their representation in the community[.]" United States v. Green, 343 F. Supp. 2d 23, 33 (D. Mass. 2004) (rev'd on other grounds). Given that a black defendant is already at a distinct disadvantage in this District when it comes to the make-up of her jury, heaping additional prejudicial factors on her nearly guarantees that she will not be able to get a fair trial.

The dissemination of the lengthy complaint affidavit and color photographs to the press was likewise outrageous, and compounded the taint created by the arrest. The affidavit, authored by FBI Special Agent Krista L. Corr (Document No. 3), set forth in excruciating detail the contents of the audio and videotaped meetings between Ms. Wilkerson and the government's confidential source, providing the public with a sensational, blow-by-blow description of the alleged crimes. Indeed, one newspaper article said the affidavit read "like a dime-store political thriller." "Bribery defendant Wilkerson," *Boston Globe*, 10/29/09. The affidavit also included, among other things:

- Ms. Wilkerson's prior federal conviction on an unrelated matter (failing to file tax returns), and a probation violation (Affidavit, ¶5);

- Ms. Wilkerson's "history of campaign violations" (Affidavit, ¶6);

- affirmative characterizations of Ms. Wilkerson's activity as "taking thousands of dollars in bribes" (Affidavit, ¶6), despite the fact that this was – and remains – a mere allegation and not a proven fact; and

- an affirmative characterization of Ms. Wilkerson's testimony in an unrelated criminal

matter as "false" (Affidavit, ¶7).

Including all of this information in the complaint affidavit was, as this Court has already pointed out, utterly unnecessary to establish probable cause. Instead, it was clearly calculated to provide maximum (negative) media exposure and ensure Ms. Wilkerson could never receive a fair trial – or, as this Court put it, to create "press availabilities that manage to gin things up a bit." Tr. at 22. And of course, by including this type of information in the complaint affidavit, the government conveniently circumvented the requirements of Local Rule 83.2(A).[5]

Moreover, the color photographs attached to the unnecessarily detailed and inflammatory complaint affidavit did nothing more than sensationalize the case for the media and "galvanize[] the public against" Ms. Wilkerson. "City Hall scandal," *Boston Herald*, November 22, 2008. In particular, the inclusion of the now infamous "bra stuffing" image in which Ms. Wilkerson is seen allegedly hiding money under her shirt was gratuitous at best, and the government clearly

---

[5] That Rule states, in pertinent part:

From the time of the arrest, issuance of an arrest warrant, or the filing of a complaint, information, or indictment in any criminal matter until the commencement of trial or disposition without trial, a lawyer or law firm associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement, which a reasonable person would expect to be disseminated by means of public communication, relating to that matter or concerning:

(1) The prior criminal record (including arrests, indictments, or other charges of crime), or the character or reputation of the accused . . .;

[. . .]

(6) Any opinion as to the accused's guilt or innocence as to the merits of the case or the evidence in the case.

knew its release would lead to the mocking, derisive treatment that inevitably followed.[6]
Newspaper articles referred to Ms. Wilkerson "stuffing wads of cash into her bra"; "stuffing wads of cash up [her] sweater[]"; "stuffing bribe money into her bra"; "stuffing wads of moola in her Wacoal"; "burrowing up [her] sweater, like a chipmunk getting ready for winter"; "stuffing . . . marked government bills into her undergarments"; "padding her underwear with hundred dollar bills"; "sticking a wad of hundreds down [her] bra"; "padding her bra with ill-gotten gains"; "stuffing cash into her unmentionables"; and "lining her bra with dead presidents." See Exhibit A. Indeed, the media leapt on that image as a symbol of Ms. Wilkerson's inevitable guilt: according to the *Boston Herald*, she "slithered a greased palm up her cardigan and stuffed $1,000 in bribe money into her bra[.]" "Wilkerson Accused of Taking $23G in Bribes," October 29, 2008. One editorial concluded: "as the FBI photos suggest, decency is something Wilkerson sorely lacks." "Dianne in denial," *Boston Herald*, October 30, 2008. Another opined that "[t]he photograph of Wilkerson stuffing her bra with tainted cash is the ultimate image of a politician wrapped up in herself." "Wilkerson's fall," *Boston Globe*, October 29, 2008. Adrian Walker perhaps summed it up best in his *Globe* column: "Thanks in part to the pictures the government released hours after her arrest, Wilkerson became an instant punchline. The public couldn't be rid of her fast enough." "Arresting images," June 5, 2009.

    As another district court in this circuit has recognized, the impact of the release of such a detailed affidavit (even when not coupled with photographs) can be highly prejudicial to a criminal defendant, and its dissemination is thus entirely inappropriate. In <u>United States v.</u>

---

[6] A Google news search revealed that there were nearly 100 print references, from October 2008 to the present, to Ms. Wilkerson and her bra (not including those in which some clever euphemism was used to describe the incident).

Cianci, the court – in ruling on whether the media was even entitled to see a lengthy, prejudicial search warrant affidavit submitted in connection with the government's investigation into then-Providence Mayor "Buddy" Cianci on charges of racketeering – reasoned that "[t]he understandably intense media coverage of this case virtually assures that, if the . . . affidavit is unsealed, its contents will be published and broadcast throughout the state and among the pool of prospective jurors." 175 F. Supp. 2d 194, 203 (D. R.I. 2001). In turn, the court commented, dissemination "would create a substantial risk of prejudicing the defendants' right to a fair trial." Id. at 203-204.

That is, of course, precisely what has already occurred here, and it has occurred because of the outrageous, calculated, manipulative actions of the government, actions that violated Ms. Wilkerson's due process rights. For this reason, the indictment should be dismissed. See Barrera-Moreno, 951 F.2d at 1091.

**II.  In the Alternative, Highly Prejudicial Pretrial Publicity Warrants a Change of Venue Pursuant to Fed. R. Crim. P. 21(a).**

The due process clause of the Fourteenth Amendment guarantees a criminal defendant the right to "a trial by an impartial jury free from outside influences." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966). See also Irvin v. Dowd, 366 U.S. 717, 722 (1961); Rideau v. Louisiana, 373 U.S. 723 (1963). Courts have long recognized that prejudicial pretrial publicity can impede a defendant's right to due process by undermining the impartiality of the jury pool; in such a case, "a change of venue may be granted if the court determines that there exists in the district 'so great a prejudice against the defendant that he cannot obtain a fair and impartial trial.'" United States v. Anguilo, 897 F.2d 1169, 1181 (1st Cir. 1990), quoting United States v. Drougas, 748 F.2d 8, 29 (1984) (additional citation omitted). In determining whether a change of venue is

proper, the court inquires: "1) whether jury prejudice should be *presumed* given the facts before [it]; or 2) if prejudice should not be presumed, whether the jury was *actually* prejudiced." Id. (emphasis in original). Jury prejudice is presumed where "prejudicial, inflammatory publicity about [a] case so saturated the community from which [the defendant's] jury was drawn as to render it virtually impossible to obtain an impartial jury." Id., quoting United States v. McNeill, 728 F.2d 5, 9 (1st Cir. 1984) (additional citations omitted). "To justify a presumption of prejudice under this standard, the publicity must be both extensive *and* sensational in nature." Id. (emphasis in original).

In United States v. Abrahams, this Court was faced with a situation in which eleven defendants were named in a 50-count indictment charging conspiracy and wire fraud. 466 F. Supp. 552, 555 (D. Mass. 1978) ("Abrahams II"). Defendant Abrahams was "the linchpin of the alleged conspiracy," id., and as such, was the primary subject of a "voluminous collection of newspaper articles" that "paint[ed] a black and bleak picture" of him. Id. at 557, quoting United States v. Abrahams, 453 F. Supp. 749, 751, 752 (D. Mass. 1978) ("Abrahams I"). As the Court described it in Abrahams I:

> the extensive pretrial publicity in all Boston media with respect to the allegedly unlawful behavior of the defendant . . ., defendant's prior convictions, and the other charges pending against him has created in the District of Massachusetts an atmosphere of pervasive community prejudice so inflammatory as to substantially reduce the likelihood of Abrahams obtaining a fair trial before a panel of impartial jurors anywhere in this District.

453 F. Supp. at 753. The publicity to which the Court referred included, among other things, articles referring to the defendant as a "con man," "swindler" and "imposter," id. at 751; articles referencing defendant's past criminal conduct; articles describing the defendant's alleged criminal activities "as if they were indisputable facts," id. at 752; demeaning, hostile and

inflammatory statements about the defendant made by public officials; and "[s]uggestively captioned photographs . . . and caricatures of the defendant," id. In addition to the newspaper articles, there were similarly damning television and radio broadcasts. These stories, determined the Court, amounted to

> the kind of prejudicial statements or records of conviction, arrests, or indictments emanating from a public official, zealous attempts by the media to arouse a community on a particular trial, . . . perjorative characterizations of a defendant, [and] description of evidence against the accused . . . [which] presen[t] the "greatest hazards" to a fair trial.

Id. at 753, quoting Patriarca v. United States, 402 F.2d 314, 317 (1st Cir. 1968), cert. denied, 393 U.S. 1022 (1969).

The same types of inflammatory news coverage that required a change of venue in Abrahams are present here as well. Headlines such as "Brazen betrayal," "Darling, that's no way for a lady to behave"; "Lady Di victimizes voters"; and "The Wilkerson train wreck" permeated the newspapers in the weeks following Ms. Wilkerson's arrest. See Exhibit A. As set forth above, she was roundly mocked as a "bra-stuffing bribe-taker" lacking decency and morals, and her past legal troubles were highlighted by the media as evidence of a pattern of wrong-doing, branding her a "convicted tax cheat and serial campaign finance offender." Ibid. Moreover, her colleagues began pronouncing her guilt, in the press, before she had even been indicted. On October 29, 2009 – one day after Ms. Wilkerson's arrest – Mayor Thomas Menino, through a spokesperson, was already proclaiming himself "very disappointed obviously in the senator," "Probe rocks City Hall," *Boston Herald*, October 29, 2008, who he said committed "an unacceptable breach of trust." "Affidavit depicts pol manipulating levers of power," *Boston Globe*, October 29, 2008. A few days later, Senator Brian Joyce of Milton declared, "This just

underscores what people already think of us, that we're crooked," and another unnamed senator opined: "To put it in Catholic terms, this isn't a venial sin. It's a mortal sin." "There's grace in goodbye," *Boston Globe*, October 31, 2008.

While defendant has only gathered stories from the *Boston Globe* and the *Boston Herald* – the two major metropolitan newspapers in the Boston area – this coverage spread across the entirety of Massachusetts, irreparably tainting the jury pool and making it impossible for Ms. Wilkerson to receive a fair trial anywhere in this District. Thus, a change of venue is proper.

### Conclusion

For the reasons set forth above, this Court should dismiss the indictment or, in the alternative, grant a change of venue.

Respectfully submitted,

/s/ Max D. Stern

Max D. Stern
BBO N0. 479560
Alexandra H. Deal
BBO No. 660645
Stern, Shapiro, Weissberg
 & Garin, LLP
90 Canal Street, Suite 500
Boston, MA 02114-2022
(617) 742-5800

Dated: November 2, 2009

**CERTIFICATE OF SERVICE**

      I hereby certify that this document(s) filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 2, 2009.

    */s/ Alexandra H. Deal*