UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 08-10345-DPW |
| | ) | |
| DIANNE WILKERSON | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM AND MOTION FOR UPWARD DEPARTURE

"There are some individuals who, because they hold public office, believe that the law does not apply to them, as they consider themselves above the law. The Defendant Wilkerson is one of those." United States v. Dianne Wilkerson, Crim.No. 97-10243 (D.Mass), *Memorandum and Order*, June 12, 1998.

The United States of America, by and through Assistant United States Attorneys John T. McNeil and James P. Dowden, respectfully submits this sentencing memorandum and motion for upward departure. As outlined below, given all the factors relevant to sentencing in this case, the government intends to recommend that the defendant be sentenced to 48 months incarceration to be followed by 36 months of supervised release. A sentence of 48 months incarceration is necessary to reflect the seriousness of the defendant's crime and to promote respect for the law; at the same time, it is unnecessary to impose a greater sentence to meet the objectives of 18 U.S.C.§ 3553(a).

The government's proposed sentence of 48 months is two months above the high end of the sentencing range calculated in the Presentence Report (PSR). PSR¶153. The government therefore moves for an upward departure under the Sentencing Guidelines pursuant to USSG § 4A1.3 (inadequacy of criminal history score), USSG § 2C1.1 comment (n.3 & n.7)(bribe payments do not adequately reflect the benefit received or the seriousness of the offense), USSG

1

§ 2C1.1 comment (n.7)(systematic or pervasive corruption of a government office which may cause loss of public confidence in government), and USSG § 5K2.7 (unusual disruption in government function).  The government also moves for an upward variance pursuant to 18 U.S.C.§3553(a) on the same grounds.

The government makes this sentencing recommendation contingent on all terms of the plea agreement in this matter, including the defendant's "unequivocal acceptance of responsibility for the crimes charged in Counts 2, 3, 4, 6, 7, 8, 9 and 10 of the Indictment . . ." [D.165, Plea Agreement at p.4].  Moreover, this recommendation is voided if the defendant "[f]alsely denies, or frivolously contests, relevant conduct for which [she] is accountable under USSG §1B1.3."  [*Id*. at p.3].  Thus, the government requests the opportunity to assess any statements made by Ms. Wilkerson and her counsel at sentencing before making a final recommendation to the Court.

**I.    Past as Prologue:  Wilkerson's Prior Federal Conviction and Violation of Probation.**

The starting point for any sentence to be imposed in this case – and any motion for an upward or downward departure – should be Wilkerson's prior federal conviction and her record while under Probation's supervision.  While that conviction occurred in 1997, it nonetheless provides critical information about the need for a substantial incarcerative sentence in this case.  In sum, Wilkerson learned nothing from her prior conviction: she characterized her criminal conduct as a "personal" matter; she persuaded the Court to grant a downward departure which ultimately proved to be undeserved; she sorely tested the limits of the Probation Office charged with managing her; and she came away from that experience emboldened to engage in a pattern of unlawful conduct that continued for another decade until her arrest in this case.

The Court departed downward from the applicable guideline range in that matter, rejecting the government's recommendation for a guideline sentence which included a short period of confinement in the form of community confinement. [*U.S. v. Wilkerson*, Crim.No. 97-10243 ("*Wilkerson I*") D.16,17,18]. While a transcript of that sentencing hearing was not made, it appears that the Court did so as a result of Wilkerson's argument that she effectively represented a traditionally under-served community and provided critical assistance to those in greatest need.[1] The Court pointedly rejected Wilkerson's claim that her crime was a "personal" matter[2]:

> The payment of taxes is <u>not</u> a "personal matter." It is a <u>public</u> obligation - to fail to do so is a crime against the <u>public</u>. Taxes are what citizens pay for civilized society. Those who tax others should themselves pay their own taxes. . . For an elected official to require of others that which she herself has failed to do is an act of arrogance. . . An elected official has the responsibility to set an example of integrity to her constituents and not, by her conduct, to provide some with a specious excuse to disregard their own civic obligation.

*Wilkerson I, Memorandum*, May 1, 1998 (*emphasis in original*).

Just over four months after imposing sentence, Wilkerson tested the limits of her probation and personally pressed the Court for relief from the terms of her home confinement. The Court promptly rejected Wilkerson's request, recognizing that she sought "special treatment

---

[1] Wilkerson moved for a downward departure on four bases: "(1) the conduct in the case was an aberration in an otherwise exemplary life of service to others; (2) the offense is mitigated by Ms. Wilkerson's extraordinary charitable works, community, and public service; (3) the collateral consequences of the offense are sufficiently punitive due to defendant's public stature; and (4) family circumstances favor a sentence of probation." [*Wilkerson I*, D.14 at 1].

[2] In a statement Wilkerson issued when her plea agreement became public, she stated in relevant part: "In no way do I want to downplay the seriousness of this matter. For public officials, there should be a higher expectation about how we conduct even our personal affairs. This is a personal tax matter. . ." *Statement of Senator Dianne Wilkerson*, September 19, 1997. *See* PSR¶103.

because of [her] public position." [*Wilkerson I*, D.27 handwritten endorsement on letter].  A few days later, the Court entered a pointed memorandum in support of its Order noting that, "Senator Wilkerson does not seem to realize that she stands convicted of a serious public crime." [*Wilkerson I*, D.20].

Two months later, Wilkerson was before the Court again, having violated the terms of her home confinement on several occasions. [*Wilkerson I*, D.23].  In another pointed Order the Court concluded:

> The Defendant Wilkerson is oblivious to the fact that she stands convicted of a serious public crime.  It is obvious to the Court that it was her intention to blatantly violate her conditions of home confinement in open and public defiance of a Court Order. . . . The Defendant Wilkerson uses her public office as a defense to her violation of a court order.  There are some individuals who, because they hold public office, believe that the law does not apply to them, as they consider themselves above the law.[3]  The Defendant Wilkerson is one of those. . .

The Court then extended Wilkerson's probation and added, as a condition of that probation, that she serve 30 days in a halfway house.  [ *Id.*].

These interactions with the Probation Office and the Court amply demonstrated that: Wilkerson learned little or nothing from her conviction and the sentence had little deterrent effect; she displayed a remarkable disregard for the Court and the criminal process; and she approached the entire matter with "arrogance" and "public defiance."  PSR¶103.  The Court's ultimate findings proved prophetic.  As outlined below, between Wilkerson's conviction in 1997 and her plea in this case, Wilkerson repeatedly demonstrated that she believed that she was above the law.

---

[3]It is also notable that at the time this criminal case was pending, Wilkerson was also facing the first of her campaign finance violation suits filed by the Massachusetts Attorney General, which was based on repeated violations of applicable state law.  PSR¶138.

## II. Given Wilkerson's peristent history of law-breaking, and her prior federal criminal conviction, Wilkerson is more appropriately sentenced under Criminal History Category II.

The PSR concludes that Wilkerson falls within Criminal History Category ("CHC") I, the lowest criminal history category. For the reasons set forth below, through either an upward departure pursuant to USSG § 4A1.3 or through an upward deviation pursuant to 18 U.S.C. §§ 3553(a)(1) (history and characteristics of the defendant) and (a)(2)(A) (need to provide just punishment), the Court should sentence Wilkerson as if she fell within CHC II. The resulting guideline range will be 41-51 months. The government's recommended sentence falls squarely within that guideline.

As detailed in the PSR, Wilkerson has a long history of violating laws applicable to her public office or abusing her office to obtain cash and other special treatment. This persistent history of law breaking, coupled with her prior conviction, compel the conclusion that Wilkerson more closely resembles defendants who fall within CHC II. *See* USSG § 4A1.3(a)(4)(A)("the court shall determine the extent of a departure under this subsection by using, as a reference, the criminal history category applicable to defendants whose criminal history or likelihood to recidivate most closely resembles that of the defendant's").

From the outset of her political career, Wilkerson began breaking laws applicable to her office. In a case filed by the Massachusetts Attorney General in 1995, she was alleged to have committed numerous violations of campaign finance laws during her 1992 and 1994 campaigns for Senate and her 1995 annual filing. PSR¶138. Wilkerson ultimately settled that case in 1998 and agreed to $11,500 in civil forfeitures. *Id.* This conduct overlapped with her income tax crimes which covered tax years 1991, 1992, 1993, and 1994. [*Wilkerson I*, D.1].

While still on probation for her federal tax conviction, Wilkerson entered into an agreement with the Boston Bank of Commerce ("BBOC") to solicit private sector deposits for that bank. PSR¶141. Wilkerson was to identify "deposit prospects" for the bank and "actively solicit such prospects for significant funds," and was to be paid between $1,000 and $2,000 per month.[4] *Id.* After taking the paid consulting job with BBOC she then advocated in her capacity as a State Senator for BBOC to receive some of the bank branches which were being divested as part of the Fleet/BankBoston merger. *Id.* In September 2001, the State Ethics Commission found that she was in violation of the conflict of interest laws: "By advocating in testimony and written submissions and/or letters as a state senator . . . while she had a significant private commercial relationship with a potential beneficiary of her officials actions . . . Wilkerson violated [M.G.L.c. 268A] §23(b)(3)." *Id.* The Ethics Commission settled the matter with Wilkerson for a monetary penalty. *Id.*

Wilkerson engaged in another series of campaign law violations between 2000 and 2007. PSR¶139. In a second case filed by the Massachusetts Attorney General in 2005 (and later amended to include two additional years), the complaint alleged that these new violations were "more pervasive" than those in 1992-1995:

> The prolonged noncompliance of Wilkerson and [her campaign] Committee with the [financial disclosure requirements of M.G.L.c. 55, § 18] and the financial and other reporting requirements . . . has made it impossible for OCPF to determine, and for the citizens of the Commonwealth to ascertain, how and from whom Wilkerson, as a member of the Senate, raised campaign funds, and to whom and for what purposes the Committee paid those funds out.

---

[4] Among the persons and entities Wilkerson identified to the BBOC as "deposit prospects" were businessman A.W., two of his companies, and another businessman, C.T. PSR¶141. All had business in Wilkerson's district and stood to gain from her official actions. *Id.*

*Verified Complaint*, <u>Director of the Office of Campaign and Political Finance and Commonwealth of Massachusetts v. Dianne Wilkerson, et al.</u>, Sup.Ct.No. SUCV2005-04123; *see* Exhibit 1 at 1 (complaint).

These campaign finance violations were occurring at the same time that Wilkerson was engaged in a series of unethical and unlawful financial transactions. For instance, between November 2002 and October 2006, a local businessman, A.M., paid Wilkerson on eight separate occasions a total of $5,000 in connection with his efforts to obtain her support for his plan to develop Parcel 8. PSR¶52. None of these payments, which ranged from $500 to $1,000 on each occasion, were reported to any government authority. *Id*. These payments were virtually identical to those charged as extortion under color of official right in this case, and could readily have given rise to criminal prosecution. *Id*.

Likewise, between 2003 and 2004, Wilkerson solicited and collected over $100,000 from wealthy individuals and members of her community to help her pay the tax debt she incurred in connection with her criminal tax violations. PSR¶103. The solicitation and receipt of these funds violated state ethics laws and contravened specific advice from the State Ethics Commission. *Id*. Moreover, in failing to report to the IRS these solicited "gifts", she also violated the terms of her Offer In Compromise Agreement with the IRS. *See* Exhibit 2 (IRS tax report filed under seal). Remarkably, her unlawful solicitation of funds also resulted in a net profit to her. *Id*. As part of her civil settlement with the IRS in which she owed more than $150,000 in taxes, penalties, and interest, the IRS agreed to reduce the moneys she owed to the federal government by more than $70,000; Wilkerson agreed to pay the IRS the remaining $80,000. *Id*. Immediately upon reaching an agreement with the IRS, she solicited and received

$108,250 over a period of several months. *Id*. Thus, as a result of her federal tax crime she ended up with an additional $28,250 in cash in her pocket, while also continuing to avoid over $70,000 in funds owed in past federal taxes, interest, and penalties.[5] *Id*. Wilkerson's records reflect that she spent over $20,000 on furniture, paying a credit card bill, paying her mortgage, and providing money to her adult children from these excess solicited funds.[6] *Id*.

In 2005, Wilkerson engaged in another set of unethical and ultimately unlawful financial transactions. Through the efforts of businessmen A.W. and J.K., individuals who had business in her district and elsewhere with the state government, Wilkerson obtained a no-show job at a local college. PSR¶142. In pressing the local college to give Wilkerson a $15,000 contract, A.W. and J.K. were seeking to assist Wilkerson in meeting her "annual personal operating deficit of $60,000."[7] *See* Exhibit 3 at 37-44 (transcript filed under seal). Wilkerson has never disclosed A.W.'s role in this effort to the Ethics Commission despite the fact that she became the legislative champion of one of his major Boston development projects, and managed to include a

---

[5] It is unclear whether her solicited "donors" knew that she ended up with a net profit from this solicitation, or whether they were defrauded by her claims that the funds would be used to pay the outstanding tax debt.

[6] While the 2004 solicitation of more than $100,000 in cash and checks was extraordinary standing alone, in reviewing Wilkerson's bank records the IRS discovered an additional $121,190.00 in income from unknown sources between 2004 and 2007. This is over and above the $108,250.00 discussed above. *Id*.

[7] The then president of a local college testified in grand jury that J.K., a fundraiser and friend of A.W., told him that he and A.W. were concerned about Wilkerson's financial problems and that he and A.W. were "working to help [Wilkerson] find ways to earn money." Exhibit 3 at 38. He also testified that, "in her annual expenses and income, there was a $60,000 debt," and that she would need money on an ongoing basis. *Id.* at 40. He also testified that the $15,000 from that local college was only part of A.W.'s and J.K.'s plan to provide income for Wilkerson; he testified that J.K. also told him that J.K. was going to seek a similar arrangement with a second local college. *Id.* at 38.

$4.3 million earmark in a Senate bill for that project. *See, e.g.* Exhibit 4 (Wilkerson's web site, which trumpets this $4.3 million earmark as one of her accomplishments in FY2007); *see also* Exhibit 5 (news articles in which Wilkerson is widely recognized as the primary legislative champion of this project).

Indeed, the federal crimes charged in this case flowed seamlessly from Wilkerson's steady stream of unlawful conduct which commenced in 1992. As set forth in the PSR and Second Superseding Indictment, her extortion under color of official right began in 2007 and continued until her arrest in 2008. Remarkably, during the period of the undercover operation, Wilkerson settled her second campaign finance violation case with the Attorney General. PSR¶139. In July 2008 – during the same period that she was taking cash payments from undercover agents – Wilkerson admitted to violations of the campaign finance laws from 2000 to 2007 and agreed to: personally forfeit $10,000; not seek reimbursement for approximately $29,000 in claimed campaign expenditures; greater restrictions on the manner in which her campaign fund was managed; and heightened auditing by OCPF through January 2015. *Id*.

According to a supplemental filing with the Attorney General's Office, Wilkerson began violating these new terms almost as soon as they were in place. PSR¶140. Even more importantly, starting shortly after her loss of the Democratic primary in September 2008, Wilkerson commenced a sticker campaign which was to be funded entirely with illegal contributions. PSR¶74. On the undercover recordings she admitted she could not raise enough money to fund her campaign with lawful $500 contributions, and stated that she had been raising thousands of dollars unlawfully. *Id*. Moreover, she solicited $10,000 from the undercover agent, an additional $10,000 from A.M., and another $10,000 from another businessman, J.W.

*Id.* In essence, in spite of just promising the Attorney General's Office that she was going to fully comply with the law, she immediately set out to save her political career through a campaign bought with illegal contributions.

Given this history, Wilkerson should not be treated the same as other CHC I defendants. At a minimum, her persistent unlawful conduct should give rise to an upward departure or deviation to a CHC II.

### III. The sentencing guideline range does not adequately account for the value of the liquor license or direct designation legislation.

The Court should also, or in the alternative, grant an upward departure pursuant to USSG § 2C1.1 comment (n.3 & n.7)(bribe payments do not adequately reflect the benefit received or the seriousness of the offense) or an upward deviation pursuant to 18 U.S.C. §§ 3553(a)(1) (nature and circumstances of the offense) and (a)(2)(A)(need for sentence to reflect the seriousness of the offense and just punishment for the offense). PSR¶171. The guideline calculation in this case is based in part on the "value of the payment, the benefit received or to be received in return for the payment [of a bribe] . . . whichever is greatest . . ." *See* USSG § 2C1.1(b)(2). Both the plea agreement and the PSR use the value of the payments made by Wilburn and undercover agents rather than the value of the benefits to be received. PSR¶93. This amount – $23,500 – for a liquor license for Dejavu and for state legislation which directly designated Parcel 8 to the undercover's chosen development team, is an extraordinarily conservative estimate of the benefits to be received, and does not adequately reflect the scope of the criminal conduct in this case. *See, e.g. United States v. Edwards*, 496 F.3d 677, 681-685 (D.C. Cir. 2007)(noting that the court need only make a "reasonable estimate of the loss" and concluding that the bribe amount failed to reflect the extent of the corrupt conduct); *United*

*States v. Griffin*, 324 F.3d 330, 366 (5th Cir. 2003)(noting that "the district court need not determine the value of the benefit with precision").

The Sentencing Guidelines address this issue in Application Note Seven to USSG § 2C1.1 (emphasis added):

> **Upward Departure Provisions**. – In some cases the monetary value of the unlawful payment may not be known or may not adequately reflect the seriousness of the offense. For example, a small payment may be made in exchange for the falsification of inspection records for a shipment of defective parachutes or the destruction of evidence in a major narcotics case. In part, this issue is addressed by the enhancements in §2C1.1(b)(2) and (c)(1), (2), and (3). **However, in cases in which the seriousness of the offense is still not adequately reflected, an upward departure is warranted**. See Chapter Five, Part K (Departures).

In this case there are several alternative measures of the benefit to be received in return for the bribe payments. With respect to the liquor license, one alternative measure of the benefit is the cost of purchasing on the open market a transferable liquor license. As noted in the PSR and in Wilburn's trial testimony, the value of a liquor license on the open market at the time was between $250,000 and $300,000. PSR¶43. Thus, if the guideline were calculated using the value of a transferable liquor license, the resulting guideline range would be substantially higher.

Another alternative to valuing the benefit associated with the liquor license is to look at the proposed income stream of Dejavu. *See, e.g. United States v. McNair*, 605 F.3d 1152, 1229-30 (11th Cir. 2010)(using $20 million in gross revenue received over a period of time resulting from a much smaller bribe amount as the appropriate measure of the benefit received under the guideline). As Wilburn testified at the Turner trial, without a liquor license the club could never open. The projected financial statements admitted at the Turner trial reflect that liquor sales in the first three years of the club were projected at an average of approximately $1.3 million per

year and constituted roughly half the club's revenue each year. *See* Exhibit 6. Moreover, the club projected an average net income from operations of $874,000 per year. While the government is not pressing for an upward departure which reflects the full projected net income of Dejavu, these figures readily reveal that the liquor license was worth a great deal more than the $8,500 paid to Wilkerson to obtain a liquor license.

A third measure for calculating the value of a non-transferable liquor license is the cost of borrowing funds to purchase a transferable license. In other words, in the absence of a non-transferable liquor license, the club would have needed to borrow at least $250,000 to obtain a transferable liquor license. Even assuming an interest rate of 5% per year, the cost of borrowing those funds would be $12,500 per year. Based on the projected financial statements introduced as evidence at the Turner trial, assuming at least a three year operating period, the license was worth at least $37,500. This would result in a guideline range of 46-57 months.

The guideline ranges set out above do not account for the added benefit of the Parcel 8 direct designation legislation. The value of this legislation is even more difficult to calculate, but is surely greater than the $15,000 in bribe payments provided to Wilkerson in connection with it. Parcel 8 itself had a fully utilized value of $5.79 million, based on projections done by architects and economists working with A.M. *See* Exhibit 7. While the legislation did not grant the property outright, it would have permitted the undercover agents to move forward on a project which had a projected value of $190 million. *Id*. It would have also avoided a costly public bidding process, which would have cost the developers hundreds of thousands of dollars.[8]

---

[8]In an interview with the architects for the Parcel 8 development, they estimated that they spent $150,000 in architectural services in preparing for the Parcel 8 direct designation and an additional $100,000 in attorney's fees and development consultants. *See* Exhibit 8 (filed under

Moreover, A.M., who had been working on the project for years, said in a recorded conversation that Wilkerson was "extremely powerful" and without her support the project was "f**king dead." PSR¶72. Thus, while there is no definitive value that can be placed on a Senator's support, or her introduction of legislation which would directly designate the key parcel of land to the developers, any reasonable estimate far outstrips the $15,000 paid by the undercovers in this case.

Taken together – the underestimation of the value of the liquor license and the underestimation of the value of the direct designation legislation – an upward departure is warranted. An upward departure of several levels would be reasonable, but the government is only asking for a modest upward departure in light of all the factors in this case.

### IV. Wilkerson's Conduct Reflects a Systematic and Pervasive Corruption of her Senate Office.

Finally, the Court should also, or in the alternative, grant an upward departure or deviation pursuant to USSG § 2C1.1 comment (n.7)(systematic or pervasive corruption of a government office which may cause loss of public confidence in government)[9] and USSG § 5K2.7 (unusual disruption in government function)[10]. Wilkerson's extended history of abusing

---

seal).

[9] Application Note seven reads in pertinent part: "In a case in which the court finds that the defendant's conduct was part of a systematic or pervasive corruption of a government function, process, or office that may cause loss of public confidence in government, an upward departure may be warranted. *See* § 5K2.7(Disruption of Governmental Function)."

[10] USSG§ 5K2.7 reads in pertinent part: "If the defendant's conduct resulted in a significant disruption of a governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected. Departure from the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense, and unless the

13

her public office for personal gain – as best reflected by the payments she began requesting of A.M. in connection with Parcel 8, the tens of thousands of dollars she solicited in connection with the payment of her tax debt, the no-show job through which she obtained $10,000 from a local college, and the use of her campaign account to benefit herself and family members – demonstrates the extent to which she had corrupted her office even before the undercover operation commenced.

Moreover, in the instant case, Wilkerson engaged in an extraordinary range of official acts in an abuse of her public office – she introduced legislation, delayed the passage of legislation, placed holds on unrelated legislation to advance her interests, lobbied the Senate President and Senate colleagues, lobbied members of the House, pressured local officials including the City Council President, the Mayor, the Chairman of the BLB, and called in a personal favor from a wealthy private businessman who had business before the state. Her corruption was both systematic and pervasive.

Moreover, Wilkerson has an extraordinary history of defeating the very laws passed to ensure transparency and fairness in the election of public officials. Her persistence in violating those laws led the Attorney General to conclude that it was "impossible" to determine where Wilkerson was obtaining campaign funds and how she was spending them. PSR¶139. From her very first campaign for Senate in 1992 she began violating these laws, and despite multiple warnings from state officials and civil enforcement actions, Wilkerson continued this illegal conduct until the day of her arrest in 2008. PSR¶¶138,139. The length and breadth of her

---

circumstances are unusual the guidelines will reflect the appropriate punishment for such interference." As outlined herein, the circumstances in this case are unusual.

unlawful campaign activities – which ultimately led her to secretly request $10,000 payments from the undercovers and from A.M. to run her sticker campaign in the fall of 2008 – reflected the type of systematic and pervasive corruption of her public office which justifies an upward departure.  *See, e.g. United States v. Paulus*, 419 F.3d 693, 696 -699 (7th Cir. 2005) .  Not only did Wilkerson believe that she was above the law, she also believed that the Senate office she held was hers to buy back after losing the primary.

The public reaction to the exposure of Wilkerson's corrupt activities was far greater than the "mine-run" of political corruption cases.  For example, within days of her charging the Senate voted to call for her resignation.  *See* Exhibit 9.  Shortly after, the Governor of Massachusetts created a "Governor's Task Force on Public Integrity," chaired by his chief legal counsel; that task force was charged with proposing major ethics reforms in Massachusetts.  *See* Exhibit 10.  The Governor noted that the charges in this case had "rocked the State House and shaken the public's confidence in their government" and that elected officials, "owe the people nothing less than a thorough re-examination of the current rules for ways that they can be clarified and strengthened."  PSR at pg.54.  The President of the Senate noted that with Wilkerson's resignation, "the shadow [over the Senate] was lifting," and committed to the people of the Commonwealth that, "we will restore your faith in us." *See* Exhibit 11 (*Journal of the Massachusetts Senate*, November 19, 2008).  The legislature went on to pass a significant overhaul of the state ethics and lobbying laws.  *See An Act to Improve the Laws Relating to Campaign Finance, Ethics and Lobbying*, Chapter 28 of the Acts of 2009.

These extraordinary reactions by the executive and legislative branches of state government reveal that Wilkerson's conduct caused a grave loss of public confidence in state

government and that her conduct was outside the heartland of USSG § 2C1.1.  *See, e.g. Paulus*, 419 F.3d at 696 -699 (granting upward departure, in part, on finding that defendant's conduct undermined the public's confidence in his public office, and noting that "the court was allowed to take judicial notice of the fact that public confidence . . . had been undermined").  Moreover, as the Court is aware, the media coverage of this matter has been extensive and intensive.  This coverage, and its nearly universal condemnation of Wilkerson's conduct, is reflective of the fact that her crimes caused a substantial loss of public confidence in state legislators and elected officials in general.  *See, e.g. United States v. Reyes,* 239 F.3d 722, 745 (5th Cir. 2001)(district court properly relied on extent of media coverage in concluding that defendant's conduct caused a loss in public trust).  As a result, an upward departure is warranted.

**Conclusion**

For the reasons set forth above, and contingent on Wilkerson's unequivocal acceptance of responsibility, the government intends to recommend a sentence of four years incarceration to

be followed by three years of supervised release.[11]

                                     Respectfully submitted,

                                     CARMEN M. ORTIZ
                                     United States Attorney

Date: November 19, 2010          By: /s/ John T. McNeil
                                     JOHN T. MCNEIL
                                     JAMES P. DOWDEN
                                     Assistant U.S. Attorneys

### CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

November 19, 2010                /s/ John T. McNeil
Date                                   JOHN T. McNEIL
                                   Assistant United States Attorney

---

[11] In a letter dated July 16, 2010, copied to the Probation Office, the defendant has suggested that by providing a detailed statement of relevant conduct and advocating for an upward departure, the government is undercutting its agreement in the plea agreement to recommend a four year period of incarceration.  To the contrary, as set forth above, if the defendant complies with all the terms of that agreement, including her unequivocal acceptance of responsibility, the government expects to advocate for a sentence of no greater than four years incarceration.  The government views a four year period of incarceration -- after evaluating both the grounds for an upward departure set forth herein, and what it anticipates will be the defendant's grounds for a downward departure -- as the appropriate sentence for the Court to impose.