UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | ) | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 08-10345-DPW |
| | ) | |
| DIANNE WILKERSON | ) | |
| | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO THE
GOVERNMENT'S MOTION TO STRIKE
AND IN SUPPORT OF A DOWNWARD VARIANCE**

This Memorandum responds to certain issues which arose at the prior hearing.[1/]

**I.      The Motion to Strike Should be Denied Because the Defendant's Statements are Entitled to Consideration as Part of her Right of Allocution, Qualify as Admissible Information to be Considered Under the Applicable Sentencing Procedures and, in Significant Respects, Are Independently Supported by the Record.**

The government contends in its motion to strike that statements made on the defendant's behalf in her Sentencing Memorandum and her Objections to the Presentence Report should not even be considered -- not weighed at all, but entirely disregarded. This is a remarkable position and flatly contrary to the defendant's historic and absolute right of allocution.

The right of allocution, "ancient in law," *United States v. Behrens*, 375 U.S. 162, 165 (1963) is one of those rights considered so fundamental that where it is denied, "this error can almost never be regarded as harmless." *United States v. Gonzalez-Melendez*, 594

---

[1/] The submission also includes, as Exhibit 1 hereto, a letter from Dianne Wilkerson to the Honorable Judge Douglas Woodlock.

F.3d 28, 38 (1st Cir. 2010). As the Supreme Court has recognized, the right, codified in F.R.Crim.P. 32, really comprises "two rights: 'to make a statement in his own behalf,' and 'to present any information in mitigation of punishment.'" *United States v. Green*, 365 U.S. 301, 304 (1961). By definition, allocution is "[a]n unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence." Black's Law Dictionary (9th Edition, 2009). F.R.Crim.P. 32 (i)(4) requires that before imposing sentence, the court must address the defendant personally in order to permit the defendant to speak or present ***any*** information to mitigate the sentence. Fed. R. Crim. P. 32 (i)(4)(ii). Defendant's counsel also has the opportunity to speak on the defendant's behalf and opposing counsel has the opportunity to respond (but not cross examine the defendant). See Fed. R. Crim. P. 32 (i)(4)(i) & (iii).

A judge is required to give a defendant the opportunity to speak on all topics he considers relevant. *United States v. De Alba Pagan*, 33 F.3d 125, 129 (1st Cir. 1994). And while the judge is not obliged to accept the defendant's account, *United States v. Twomey*, 806 F.2d 1136, 1143 (1st Cir. 1986), the judge is required to consider the defendant's allocution. *United States v. Burgos-Andujar,* 275 F.3d 23 (1st Cir. 2001). The underlying purpose is to allow the defendant to provide meaningful information in mitigation of punishment, *United States v. Picard*, 464 F.2d 215, 220, n.9 (1st Cir.

1972).[2]  In a typical allocution, the defendant explains her conduct, or adds context, or history, or sets forth what led to her violation of the law, tells what was in her mind, how she interpreted her situation and perceived the events, corrects misinformation, and the like – the very things that the government seeks to strike here.

---

[2]  Mitigation is allocution's most obvious purpose. Simply put, the defendant has a chance to say something to the judge that will lessen the sentence. A defendant might admit his responsibility for an offense or give details about his involvement that lessen his role.

Information that is considered mitigating varies from court to court and from sentencing system to sentencing system. However, the facts contemplated by sentencing guidelines and statutes show some agreement about the type of information that is believed (at least by legislators) to be mitigating. For example, a defendant's acceptance of his responsibility for the offense[19] has repeatedly been recognized as a mitigating fact that could be conveyed at allocution.

While an important thread in allocution theory, mitigation is not the only possible rationale. Another persistent rationale for allocution--and for sentencing hearings in general--is individualization or humanization of the defendant. Each sentence given should be tailored to fit the defendant and the offense.  The sentencing hearing, and the defendant's allocution in particular, is an opportunity for the court to learn details about the person to be sentenced. The court uses these nuances to impose a just sentence that is appropriate to the particular defendant. At its most pronounced, humanization has little in common with the traditional mitigation rationale.

Kimberly A. Thomas, Beyond Mitigation: Towards A Theory of Allocution, 75 Fordham L. Rev. 2641, 2643 (2007)

Moreover, even apart from the specific right of allocution, the defendant's statements qualify as information which can be considered under the rules governing the conduct of sentencing proceedings. The applicable guideline refers to presentation of "information," not "evidence," and the rules of evidence do not apply. USSG §6A1.3. The commentary and case law approve acceptance of "[w]ritten statements of counsel,"[3] police reports,[4] other hearsay,[5] even including "out-of-court declarations by an unidentified informant."[6]

Finally, many of the statements which the government contests are supported independently by other parts of the record. The government takes greatest issue with the defendant's characterizations of her own mental state, such as that as the events unfolded, she felt that she was not being motivated by the money, but by the desire to benefit and protect her community. Her mind-set in this respect is corroborated by numerous excerpts of her recorded conversations and supported overall by her history – well documented in the many letters submitted to this court – of standing up for the best interests of her constituents. It is not disputable that when Wilburn brought the license issue to her attention, she was truly outraged by the failure to award a single one (out of sixty!) to

---

[3] §6A1.3, Commentary, first para).

[4] *United States v. Posada-Rios*, 158 f.3d 832, 881 (5th Cir. 1998).

[5] §6A1.3, Commentary, second para; *United States* v.Inigo, 925 F.2d 641, 660 (3d Cir. 1991).

[6] §6A1.3, Commentary, second para; *United States v. Rogers*, 1 F.3d 341 (5th Cir. 1993).

anyone in the district – her district – to which they were targeted.  As the Mayor noted, she was justifiably put out and the path she then took was completely consistent with everything she had done in the past.  Similarly, there are many references in the recorded conversations to her consistent support for – and insistence upon – development in her community which would benefit the residents of that community.[7]  Even Azid Mohammed

---

[7] See Exhibit 2 for transcripts of the following.

6/18/2007, CD 7
[DW on her efforts and motivation for securing a liquor license for RW]
"Well, I'm on them every day. Just so you know, like you said, you know I'm serious about this. Because I want to see this happen at Crosstown."

8/1/2007, Cassette 19
[DW on continuing the issue without RW or IS]
"I just want to let you know that I'm not gonna tell [the legislators] nevermind at this point...You can decide what you want to do, but I'm not telling them nevermind."

8/2/2007, DVD 20
[DW on her motivations]
"I said, this is about Crosstown for me."

8/9/2007, Cassette 63
[DW on her plan to continue pursuing the license issue]
"[T]his is more my fight than your fight...I told them it's not going to go away. It's just not...But here's the thing...What I'm going to ask them, see cause I'm not so inclined to let them off the hook...You guys can be the good guys...I'm not inclined to let them off the hook cause there's a license floating out there."

8/31/2007, DVD 28
[DW on her motivation for pursuing the Home Rule Petition]
"You know how sometimes, you just kinda get ready, you say you know, I'm up for a real fight...and when it's something worth fighting for...Because these guys can't get away with stuff like that."

-5-

9/14/2007, CD 51
[DW on the reason for her interests in Crosstown]
"...Crosstown Development is something that's very special, um near and dear to me because I was involved with the concept at the inception."

9/14/2007, CD 51
[DW on motivations in the Senate to help the minority community]
"...I saw being in the State House as an opportunity to get higher up the food-chain so I'm actually one of the ones making the policies...I also believe that it is directly connectible to black people to the economics of our laws."

9/14/2007, CD 51
[DW on her role as Senator to create jobs for minority people in Boston by supporting minority businessmen]
"...It's about the reality that if I can support Ron and a business, I know that the odds are that Ron is going to create opportunities for other business peoples and employees of color to work....If we don't put our people to work, no one's going to do that. So, if I'm going to help people like you, then I've gotta know that you understand that...Because that's what it is about for me."

9/14/2007, CD 51
[DW on her motivation/focus]
"Crosstown right now is my focus..."

Transcripts to be prepared:

3/12/2008, ID 144
[DW on her motivations for obtaining a license]
"I want it to be some place in the, in the area where...again, this is about an economic development agenda for me...one that creates some opportunity to generate revenue in the community of people that I care about."

3/12/2008, ID 145
[DW on her motivations to help create opportunities in the minority community]
"I have a very public, real interest in this kind of activity...It is very important to me."

testified to that.

In this connection, it should also be emphasized that the government bears the burden of proof – by a preponderance – as to any material issue. Thus, for example, the defendant is free to contend that the government has not proved that Wilburn gave the amount of money he claims,[8] or that Mohammed offered her money without being asked,[9]

---

> 7/22/2008, ID 178
> [DW on her motivations for helping with Parcel 8]
>> "And I don't mind doing that because I believe in the project. You know I do."
>
> 8/14/2008, ID 180-181
> [DW on the Parcel 8 project]
>> "...I'm excited about it because it's what I've been looking for. Kind of knowing they're out there. This has, um, really been the focus of my life's work, you know, in the public sector. Is um, trying to not just, you know, it's not just about building buildings if you can't build people in the process."

[8] As we have shown elsewhere, the statements of Wilburn and Soto on this issue are thoroughly contradictory and inconsistent. Defendant's Sentencing Memorandum, p. 16, n. 10.

[9] While the Court has concluded that the receipt of money from Azid Mohammed was relevant conduct to the Parcel 8 scheme – because the defendant knew that he was looking for a benefit – it did not state that it credited his testimony that defendant <u>asked</u> for the money. His testimony on that point was not believable. More plausible – and true – was that the money was offered and received in similar fashion to the Wilburn and agent tenders, i.e. without demand. And, more likely, it was Mohammed who determined, on his own, that it was useful to him to "grease the wheel." The defendant's passive approach to receiving financial help was entirely consistent with her behavior for the months during which the government tried and failed, repeatedly, to get her to ask for money. Indeed, as even Mohammed conceded, when he finally put together a team, and a proposal, and asked the defendant for specific action, she asked for and he gave her nothing. His claim that defendant sought the money from him came about only after he was threatened with prosecution for participating in a bribery scheme.

and so forth. Other examples abound.[10] Without reviewing each and every contention to which the government objects, it is clear that the response to its motion is not to strike the statements, but to consider them in connection with all of the other information submitted to the Court.

## II. A Sentence Substantially Lower than the Guideline Range is Warranted by the Factors Set forth in 18 U.S.C. §3553.

At the previous hearing the Court made clear its preliminary views on several sentencing issues, tentatively rejecting all of the grounds for *departure* argued by both sides, but putting aside the question of whether any of the claims would justify *variance*

---

[10] Other examples of contentions to which the government objects are:

• That numerous persons volunteered their assistance.

See Exhibit 18 of Defendant's Objections to Pre-Sentence Report. Senator Wilkerson's faxes to those who have volunteered a gift state: "Thank you again for your kind and most generous offer of assistance."
See Exhibit 2 of Defendant's First Supplementary Submission on Sentencing. Thomas Kiley's letter to Honorable Douglas Woodlock, states on p.4, "It also was then and remains my view now that § 23(b)(3) was not violated by the 2004 fundraising effort to satisfy Ms. Wilkerson's tax obligation."

• That defendant said, or intended to say, that payments were not needed.

There were several instances where Wilburn – knowing that he was trying to create a record for the audio recording – cut off the defendant's comment when it is obvious that this is what she was trying to say. For example, See Transcript of 6/18/2007 conversation, included in Exhibit 2. [When handed $1,000 by Ron Wilburn, Senator Wilkerson objects and says "I'm, Ron, no, you've got to know, I am-" before being cut off by Wilburn.] Moreover, this is completely consistent with her conduct up until the Count Ten events, in which the government could not get her to ask.

under the post-*Booker* regime. *United States v. Booker*, 543 U.S. 220, 262 (2005). directed the Court to the considerations set forth in 18 U.S.C. §3553 in determining whether to impose a guideline sentence. Defendant submits that application of those factors indicates a sentence substantially below the guidelines in this case.

    Indisputably, the defendant is guilty of a very serious set of offenses. §3553(a)(2)(A)(first clause). Still, as even recognized prior to *Booker*, the court should keep in mind that a particular guideline is intended to cover the "heartland" of offense conduct and a particular statutory offence can cover a wide range of culpability. See *Koon v. United States,* 518 U.S. 81, 105 (1996). Extortion under color of official right – in which the essence of the crime is that the defendant receive money knowing what motivates the other person, *See United States v. Cruz-Arroyo*, 461 F.3d 69, 73 (1st Cir. 2006) – can range from the acceptance of gratuities, *Id.* at 74 ("intended as reciprocity for official acts, past or future[.]) to aggressively putting one's office up for sale. Here, up until conduct alleged in Count 10 – when the defendant's political survival was on the line – this defendant's conduct was on the passive side of the spectrum: to the evident frustration of government investigators,[11/] she did not ask for the money, and the sought-after benefits were those she truly believed were in fact in the interests of her constituents. As she says, "[w]hile things were happening I really convinced myself I wasn't doing what

---

    [11/] See Exhibit 4 of Defendant's Sentencing Memorandum, Assistant United States Attorney McNeil's specific instructions to Wilburn to "[l]ook for ways for her to suggest payment as opposed to tacitly receive what we hand her."

I did for money and that I did everything I could for a community that deserved so much more." See Letter of Dianne Wilkerson.[12]

This Court is, of course, rightly concerned with fashioning a sentence that promotes deterrence, as indicated by 18 U.S.C. §3553(a)(2)(B). But the emphasis in the statute is on "afford[ing] *adequate* deterrence" and finding a sentence which is "sufficient but not greater than necessary . . . to comply with the purposes" set forth. *Adequate* deterrence will be achieved by *any* sentence in this case, as the punishment will be known and understood by virtually every conscious person in this district. No accused public official in memory, in this district, has suffered more extensive or more negative publicity. And given that publicity, the price already paid by this defendant for her conduct, in the destruction of professional, public and personal lives, in her public humiliation, and in her destitution, is known far and wide.

Deterrence, importantly, is only one of several purposes mandated by the statute, all of equal importance. Another purpose is to "promote respect for the law." §3553(a)(2)(A)(second clause). Deterrence and promoting respect are related, in that they each depend very much on how a sentence is perceived. To be sure, both purposes suggest the need to convey the message that one who fails to abide by the law will pay a significant price. But respect for law also indicates the need for the sentence to be perceived as fair and evenhanded under all the circumstances. The sentence must both be

---

[12] See Exhibit 1 attached.

fair and be seen to be fair; otherwise, if it promotes public resentment or cynicism, then all of the goals of sentencing are defeated.  In this way, promoting respect for the law intersects with the specific and separate direction to the Court to "avoid unwarranted sentence disparities," §3553(a)(6), especially "where disparities are conspicuous and threaten to undermine confidence in the criminal justice system."  United States v. Martin, 520 F.3d 87, 94 (1st Cir. 2008).  *See also* cases cited in Defendant's Sentencing Memorandum, at p. 43.

Thus, presumptively, this defendant should not be treated more severely than others with a similar degree of culpability. While it is true that each case and each defendant is different – and therefore can be difficult to compare -- there are comparisons to be made, and comparisons which are made.  It is clear that even the government believes that a guideline sentence in this case would be above the norm in this district.  See Government Submission on Sentencing Advocacy, p. 3 ("the low end of the guideline range is the falling-off point rather than the starting point; the ultimate sentences are routinely lower than the low-end.")  And the Commission's statistics make it clear that it would be above the norm nationwide.[13]  These observations comport with the anecdotal evidence as well.  The last Massachusetts Speaker of the House pled guilty to a very serious federal crime – lying under oath to three federal judges– and received no prison

---

[13] See Exhibit 27 to Defendant's Sentencing Memorandum.

time at all.[14/] Another Massachusetts public official who was convicted of a similar offence to the one here – but whose conduct was far more calculated, and who only belatedly accepted responsibility – received a sentence of slightly more than half the minimum guideline sentence. Nationally, there have been similar results. In May of this year, for example, the Majority Leader of the New York State Senate was sentenced for an honest services fraud scheme in which, according to the allegations of the counts of conviction, he sought out consulting business from firms which had business before the legislature and he received very substantial amounts of money, far in excess of the value of work he performed.[15/] He did not plead guilty and did not accept any responsibility; indeed the sentencing judge observed that "I didn't hear one word of contrition."[16/] Still he received a sentence, two years, which was less than one-fourth of his guideline range.

Finally, the deterrence interest is also limited by the need for the Court to find a "just punishment," §3553(a)(2)(A)(third clause), which must, of course, take into account the "history and characteristics of the defendant." §3553(a)(2)(A) Thus, even if it is true that defendant's good works would not have warranted a departure under the mandatory guideline system – because her job was to do good works – in deciding whether to vary downward from the guidelines, it is essential to consider how extraordinary in amount and

---

[14/] *United States v. Finneran*, 1:05-CR-1-140-RGS.

[15/] *United States v. Bruno*, 1:09-cr-00029-GLS (N.D.N.Y.). (Documents attached in Exhibit 3).

[16/] "2 Years for Bruno," Times Union, Friday, May 7, 2010 (included in Exhibit 3).

kind her contributions have been, far more extensive than even arguable required by the job and way beyond the call of duty.[17] Critically, the letters that the Court has received provide a definitive rebuttal to the government's essential sentencing claim here – that defendant is a compulsive lawbreaker lacking in ethics or good character. Her record belies that claim and demonstrates that, on the contrary, the defendant – despite her faults and her grievous errors – has been selfless, not selfish; a person of, not without, principle; and a woman of courage, not weakness. There is an equally important message to be communicated here – that a life of charity, leadership, political courage, and relentless hard work will not be ignored when it comes to judgment day.

## CONCLUSION

For the reasons set forth above, the Court should deny the government's motion to strike and should impose a sentence substantially below the guideline range.

Respectfully submitted,

*/s/ Max D. Stern*
Max D. Stern, BBO #479560
Patricia Garin, BBO #544770
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, 5th Floor
Boston, MA  02114-2022

---

[17] Attached as Exhibit 4 are additional letters of support. Many of the letters included in this submission, as well as the previous two submissions of support letters (for a total of 102 letters) are from non-constituents describing profound assistance and advocacy Dianne Wilkerson performed on their behalf. An example of this kind of advocacy is documented in the letter of Duane Nelson, Exhibit 4, p. 159, family member of Milena DelValle who was killed in the Big Dig Tunnel Collapse in 2006.

(617) 742-5800

*/s/ Charles J. Ogletree*
Charles J. Ogletree
Harvard Law School - Hauser 516
Cambridge, MA 02138-2996
(617) 496-2054

Date: January 4, 2011.

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 4, 2011.

\s\Max D. Stern